REACHING HEARTS
INTERNATIONAL,
INC., Plaintiff,

v.

PRINCE GEORGE'S COUNTY,
et al., Defendants.

Civil Case No. RWT 05–1688.

United States District Court,
D. Maryland.

Nov. 4, 2008.

Ward B. Coe, III, Brian Travis Tucker, David William Kinkopf, Gallagher Evelius and Jones LLP, Baltimore, MD, for Plaintiff.

Mary Catherine Crawford, Brennan C. McCarthy, Peggie Nichole McWhorter, Rajeshanand Anand Kumar, Tonia Yvetta Belton Gofreed, Prince Georges County Office of Law, Upper Marlboro, MD, for Defendants.

## MEMORANDUM OPINION

ROGER W. TITUS, District Judge.

The Free Exercise Clause of the First Amendment envisions a land of religious diversity and tolerance, in which people of all faiths may freely practice the tenets of their religions without persecution or prejudice. In passing the Religious Land Use and Institutionalized Persons Act[1] ("RLUIPA"), Congress recognized that

> the right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements. The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes.

146 Cong. Rec. at S7774–S7775 (joint statement of Senators Hatch and Kennedy on the Religious Land Use and Institutionalized Persons Act of 2000). The Framers and Congress in their collective wisdom were cognizant of the power and tendency of a majority to marginalize and discriminate against an unfamiliar or unpopular minority. Thus, our Constitution and RLUIPA provide important protection for religious entities when governmental action crosses the line and results in intentional discrimination on the basis of religion in violation of the First Amendment or the Equal Protection Clause or the imposition of a substantial burden on a religious exercise in violation of RLUIPA. This is such a case.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Reaching Hearts International, Inc. ("RHI") was formed in 2000 as a congregation of the Seventh Day Adventist Church. (4/15/08 Tr. 73–74). Seventh Day Adventists believe in the proclamation of the gospel around the world and that the coming of Jesus Christ is imminent. (*Id.* at 78). Part of their religious mission is growth of their congregation and spreading the gospel. (4/17/08 Tr. 102). To that end, Seventh Day Adventists practice public evangelism, bible studies, health training, discipleship and baptism by immersion. (4/15/08 Tr. at 79). They are active in community services, education, and vacation bible schools. (*Id.*). Seventh Day Adventists are Sabbatarians, which means that they believe that they are not supposed to work on the Sabbath, which falls on Saturdays, when their worship services are held. (*Id.* at 79, 83). They meet on other days of the week for worship-related services and activities. (*Id.* at 80).

### A. The Lease in 2000 with the Cedar Ridge Conference Center

Because RHI did not have its own worship facilities when it was formed as a congregation, it entered into a lease in April 2000 with the Cedar Ridge Conference Center ("Cedar Ridge") in Spencerville, Maryland. (Pl.'s Ex. 1; 4/15/08 Tr. 75). RHI's lease payments to Cedar Ridge are approximately $80,000 per year, and the landlord has the right to terminate the lease. (Pl.'s Ex. 1). The lease limits RHI's use of the Cedar Ridge premises to Wednesdays from 6:30 p.m. to 9:30 p.m. and Saturdays from 9 a.m. to 3 p.m. (Pl.'s Ex. 1; 4/15/08 Tr. 75).

Due to the limited hours that RHI may use Cedar Ridge, RHI's congregants are unable to have family weddings or funerals. (4/15/08 Tr. at 83). Moreover, they are unable to conduct sundown vesper services to welcome the Sabbath on Friday and to recognize its end on Saturday. (*Id.* at 81). There is no baptistry at Cedar Ridge within which RHI may conduct total

**1.** 42 U.S.C. § 2000cc, *et seq.* (2000).

immersion baptism. (*Id.* at 82). Seventh Day Adventist churches usually have an elementary school associated with them, but RHI cannot have one under its lease. (*Id.* at 80, 83). RHI also does not have a choir because its lease prevents it from storing equipment or practicing there, and Cedar Ridge does not have an organ. (*Id.* at 88–89).

The limited hours under the Cedar Ridge lease also prevent RHI from offering: office hours for its congregants to meet with their pastor; classes on health, bible instruction, and revelation seminars; vacation bible classes; and youth activities including Pathfinders, which is similar to Boy Scouts for both boys and girls. (*Id.* at 79, 81–83). Furthermore, due to the limited hours on Saturdays, RHI congregants must set up for services at Cedar Ridge on Saturdays in violation of their religious proscription against working on their Sabbath. (*Id.* at 83–84). This work requires RHI congregants to provide and assemble their own sound system (four speakers, sound board, cables, and microphones), arrange chairs for the bible study classes, rearrange the chairs for the services, set up their own communion implements for the Sabbath fellowship meals, and clean up the facility after the services and classes. (*Id.* at 76, 84–85, 87).

RHI's congregation is too large for Cedar Ridge; indeed, on special occasions, the congregation overflows into the foyer of the building, where those members may watch the worship service on television monitors. (*Id.* at 86). A Seventh Day Adventist church is viewed as a "hub" for its members, and for the congregation not to have its own church is "like not having your own home." (4/17/08 Tr. 97–98, 103).

**B. The Purchase in 2002 of the Property at 6100 Brooklyn Bridge Road**

In pursuit of a home of its own, RHI formed a building committee to search for a suitable site. (4/15/08 Tr. 89, 96; 4/16/08 Tr. 161–64). Property located at 6100 Brooklyn Bridge Road in Prince George's County ("the Property") appeared to suit RHI's criteria because it was a rural setting, which is similar to the type of setting in which other Seventh Day Adventist churches are located. (4/15/08 Tr. 91, 94). The 17.08–acre Property is comprised of two parcels of land, and there is a wooded area in the rear parcel, which borders property owned by the Washington Suburban Sanitary Commission ("WSSC") that is adjacent to the Rocky Gorge Reservoir. (Pl.'s Ex. 3; 4/15/08 Tr. 91–93). The Property is in the R–A zone, which, at the time of purchase, permitted the construction of a church as a matter of right with a lot coverage restriction of 50%. (4/15/08 Tr. 94). The Property was down the road and across the county line from Bethany Christian Church. (4/15/08 Tr. 101–02; 4/16/08 42, 116).

RHI retained JFW, Inc., to do a feasibility study on the Property to determine whether RHI could build a church and have the option for future expansion on the Property. (4/15/08 Tr. 95). The study cost RHI $10,000. (*Id.*). In its study, JFW concluded that RHI could build a church on the Property. (Pl.'s Trial Ex. 4; 4/15/08 96–97). RHI then proceeded to acquire the land on February 24, 2002, for $795,000, with RHI paying $195,000 as a down payment and taking out a $600,000 mortgage that was payable at 7.5% over 60 months. (Pl.'s Trial Ex. 4; 4/15/08 96–97).

**C. RHI's Meeting with the West Laurel Community Association**

After buying the Property, RHI hired a land use law firm, civil engineers experienced in land development, and a construction company that specialized in church construction to develop a plan for the construction of the church and school, which was to be completed in phases on the Property. (4/15/08 98–99). When the plan

was developed, RHI met with the West Laurel Community Association ("WLCA"), the local community association. (*Id.* at 99). The Prince George's County Councilman for the District, Thomas Dernoga, was present at the meeting. (*Id.* at 100; 4/16/08 Tr. 115). During the meeting, the chair of the WLCA referred to Seventh Day Adventists "as being politically active" and that "it wouldn't be helpful to come into the community for that reason and that they should be very careful." (4/15/08 Tr. 100–01). There were also "very negative" comments about the Bethany Christian Church, which was up the road and across the county line from RHI's property. (*Id.* at 102). The WLCA's reaction to RHI's plan was "very hostile" in that the WLCA was concerned that RHI would "lie[ ] to them" by building a church that WLCA did not approve of aesthetically, as WLCA believed that Bethany Christian Church had done, and "there was nothing that [RHI] could possibly say at that meeting that would appease [WLCA] whatsoever." (4/16/08 Tr. 115–16).

**D. Denial of RHI's 2003 Water and Sewer Category Change Application**

Every Maryland county must develop and adopt a county water and sewer plan that covers "at least the 10–year period ... following adoption by the county governing body." Md. Ann. Code Env. § 9–503. The county plan is subject to approval by the State Department of the Environment. *Id.* A county plan is defined as a "comprehensive plan for adequately providing throughout the county ... water supply systems, sewerage systems, solid waste disposal systems, solid waste acceptance facilities and systematic collection and disposal of solid waste, including lit-

ter." *Id.* § 9–501(d). The purpose of the county plan is to ensure "develop[ment of] the water supply and sewerage systems in a way consistent with county comprehensive planning." Code of Maryland Regulations (hereinafter "COMAR") 26.03.01.02(A). The plans must include a detailed map of the county that delineates the areas served by community water and sewerage systems and designates all land into one of the six water categories and one of the six sewer categories. COMAR 26.03.01.04. The categories range from the lowest (category 1 which applies to land currently served by public water and sewer systems) to the highest (category 6 which applies to land serviced by private wells and septic systems, and for which no public water and sewer systems exist currently or are planned in future development). *Id.* Properties are usually designated in the same category for both water and sewer service. Plan at 2–4.

On November 19, 2001, the Prince George's County Council adopted the "2001 Water and Sewer Plan" ("Plan"), which remained in effect during all relevant times in this case. The Plan explained the purpose of the water and sewer category designations, as follows: "The policy of linking water and sewer categories to the stages of the development process assures that the water and sewer systems will expand appropriately to reach new development as it comes on line. Conversely, this system assures that when developments are built, adequate water and sewer service will be available." Plan at 2–3. The Plan refers only to categories 3 through 6 because all land that falls within categories 1 and 2, as defined by COMAR 26.03.01.04, are defined under the Plan as category 3 land.[2] Plan at 2–3.

2. The individual water and sewer categories are defined as follows. Plan at 2–4, 2–5. Category 6 is titled "Individual Systems" and "consists of all areas outside the limit of

planned service (Sewer Envelope), and of certain larger tracts of parkland and open space inside the Sewer Envelope." Development in this category requires the use of

The Plan also sets out the procedures to be followed to amend or redesignate property from one category to another. Depending on the type of redesignation requested, an amendment may be accomplished administratively or legislatively. Plan at 6–2. A redesignation from category 5 to category 4 may only be accomplished through the legislative amendment process. *Id.* The legislative amendment process requires the applicant to submit a proposed amendment to the County Department of Environment Resources ("DER") during one of the three annual amendment cycles. *Id.* The DER then submits the proposed amendment to the County Executive, who then submits it to the County Council with a recommendation. *Id.* The County Council votes on the amendment after holding a public hearing. *Id.*

Once a property has been redesignated from category 5 to category 4, a preliminary subdivision plan may be approved. Plan at 6–5. After a preliminary subdivision plan is approved, a further redesignation from category 4 to category 3 is required before the recordation of a final plat and approval of building permits. *Id.* This redesignation may be accomplished through an administrative amendment approved by the DER unless the County Council or the County Executive requests that the legislative amendment process be followed. *Id.*

RHI's property was comprised of two parcels: the front parcel (Parcel 28) of 7.04 acres and the rear parcel (Parcel 11) of 10.04 acres. (4/15/08 Tr. 103). In the front parcel, the front 3.4 acres are in category 3 for public water and sewer while the back 3.6 acres consists of a home (which has public water and a septic system) and land that is in category 5 for water and sewer. (*Id.*). In the rear parcel, all 10.04 acres are in category 5 for water and sewer.

In order to develop its plan for the church, school, and other facilities, RHI prepared and submitted an application for a category change that would upgrade portions of the Property (i.e. the back 3.6 acres in the front parcel and the entire 10.04 acres of the rear parcel) from water and sewer category 5 to category 4. (4/15/08 Tr. 104–05; Pl.'s Ex. 6). The application was submitted on March 31, 2003, to the DER staff, the Maryland–National Capital Park and Planning Commission ("M–NCPPC"), the WSSC, the County Health Department, and the County Department of Public Works and Traffic. (4/17/08 Tr. 116). Any comments that were received were then compiled by the DER staff into a staff report. (*Id.* at 118–19).

In the DER staff report on RHI's application, the reviewing governmental agencies did not find that any portion of the application failed to comply with the crite-

"permanent individual water supply and waste water disposal systems (i.e., well and septic systems) or shared facilities approved by the County." Category 5 is titled "Future Community Service" and "consists of land inside the Sewer Envelope that should not be developed until adequate public facilities are available to serve the proposed development." Category 5 properties require a redesignation to category 4 prior to the development review process, however, small residential developments may be approved for the use of interim individual systems in

certain circumstances." Category 4 is titled "Community System Adequate for Development Planning" and "includes all properties inside the Sewer Envelope for which the subdivision process is required." Category 3 is titled "Community System" and "comprises all developed land on public water and sewer, and undeveloped land with a valid preliminary plan approved for public water and sewer." Individual water supply and wastewater disposal systems will not be approved for properties in this category unless special circumstances exist.

ria set forth in the water and sewer plan nor was there any indication in the agencies' comments that the application should not be approved. (Pl.'s Trial Ex. 7; 4/17/08 Tr. 155–57). Shirley Branch, who was the water and sewer plan coordinator for DER, testified that she was not aware of any regulations that would have resulted in denial of RHI's application for a water and sewer category change. (4/17/08 Tr. 156). In fact, the DER staff and the County Executive both recommended advancement to category 4, which is what RHI's application requested. (*Id.* at 138). At the public hearing on RHI's application before the County Council on July 23, 2003, RHI Pastor Michael Oxentenko and Russell Shipley, RHI's counsel, testified in support of RHI's application; there was no testimony in opposition to RHI's application and the County Council members did not ask any questions or make any negative comments. (4/15/08 Tr. 106–07).

The County Council held a meeting on July 29, 2003, and initially delayed acting upon RHI's application because Councilman Dernoga was late. (4/16/08 Tr. 199). When Dernoga arrived, the Council called for a vote on RHI's application and voted for its approval. (*Id.*). Then, Dernoga was observed to have said something to the other council members, who then reversed themselves and voted against RHI's application. (*Id.*). The stated reasons for the County Council's denial of RHI's application for an upgrade from category 5 to category 4 were that the proposed church would be "next to a reservoir, out of character with the surrounding large-lot residential development, and impervious surfaces could have a negative

impact on water quality." (Pl.'s Trial Ex. 9; 4/15/08 Tr. 107–08). No member of the County Council raised any of these concerns at the public hearing. (4/15/08 Tr. 108).

At the same meeting in which the County Council denied RHI's application, it approved a water and sewer category change application from category 5 to category 4 for Dugan's Addition to Meromy [3] Estates ("Dugan's Estates"), a residential development of five single-family homes, which was in the 6200 block of Brooklyn Bridge Road (the same road as RHI's property) and also is adjacent to the WSSC property that is adjacent to the Rocky Gorge Reservoir. (Pl's Trial Ex. 11; 4/15/08 Tr. 109). The reviewing governmental agencies, as they did with RHI's application, recommended approval of the Dugan's Estates category change application. (Pl.'s Trial Ex. 11; 4/15/08 Tr. 129–300). Unlike RHI's property, Dugan's Estates was traversed by a stream that drained directly into the Rocky Gorge Reservoir. (4/15/08 Tr. 132).

Out of the 28 applications the County Council considered at this meeting, the Council deviated from the County Executive's recommendation only twice; the Executive recommended approval of RHI's water and sewer category change application for a church but the Council denied it, and the Executive recommended denial of a category change application for 654 single-family homes but the Council approved it. (Pl.'s Trial Ex. 8). RHI's application was the only one that sought a religious land use; all of the others sought commercial or residential land uses. (*Id.*).

3. In the staff evaluations and Planning Board recommendations, the property is referred to as "Dugan's Addition to *Meromy* Estates," however, it is referred to as "Dugan's Addition to *Memory* Estates" in the preceding summary page to those evaluations and recommendations. *Compare* Pl.'s Trial Ex. 11 at PGCTY00436 (emphasis added) with Pl.'s Trial Ex. 11 at PGCTY00435 (emphasis added).

On September 22, 2003, RHI filed a Petition for a Writ of Mandamus in the Circuit Court for Prince George's County seeking to have the Court order the County Council to approve RHI's application. A mandamus petition seeks to compel the performance of a non-discretionary act. The Circuit Court ruled in favor of the County on January 31, 2005. The Circuit Court found that the County Council's rationale for denying RHI's application was not arbitrary or capricious because (1) it was based upon legitimate reasons supported by the record, (2) RHI did not have an "unfettered" right to its application's approval (i.e., it was a discretionary act), and (3) the County Council was not obligated to accept or follow the recommendations of the various reviewing agencies. On March 1, 2005, RHI appealed this decision to the Court of Special Appeals of Maryland. The Court of Special Appeals affirmed the Circuit Court's decision on August 17, 2006. The Court of Special Appeals held that mandamus relief was not necessary or warranted because (1) RHI had not been prohibited from developing its property and (2) the County Council's discretion to pick and choose among applicants was not arbitrary and capricious action. On October 3, 2006, RHI petitioned the Court of Appeals of Maryland for a Writ of Certiorari, which was denied on December 8, 2006.

## E. The Drafting and Enactment of CB–83–2003

After its water and sewer category change application was denied and while RHI's Petition for a Writ of Mandamus was pending in the state court system, RHI worked with its consultants to develop a modified plan that would provide for construction of a church on the front portion of the front parcel, which contained the 3.4 acres that were in water and sewer

category 3. (4/15/08 Tr. 111). When RHI discussed this revised plan with the M-NCPPC staff, RHI first learned about a new piece of legislation that the County Council had passed on November 25, 2003, which was CB–83–2003.[4] (*Id.* at 112). CB–83–2003 dramatically reduced the allowable net lot coverage for certain non-residential use properties in residential zones that were within 2,500 feet of a drinking water reservoir from 50% and 60% to 10% and 20%. (Pl.'s Trial Ex. 16). "Lot coverage" refers to all impervious surfaces that are covered and would include buildings, parking spaces, and roads. (4/17/08 Tr. 31). CB–83–2003 had been drafted during the August 2003 recess, which began at the end of July 2003. (4/22/08 Tr. 121). RHI's water and sewer category change application had been denied on July 29, 2003. (Pl.'s Trial Ex. 8).

Councilman Dernoga was the bill's sponsor; he "explained that the provisions of the bill are intended to provide consistency with the policy adopted by Montgomery County" in the 1977 version of the Master Plan, which affected properties in his district that were adjacent to the reservoir. (Pl.'s Trial Ex. 16; 4/15/08 Tr. 114). The effect of CB–83–2003 was that RHI's plan to build a church on the front 3.4 acres of the front parcel, which was in category 3, was no longer permissible because it would have exceeded the new 10% lot coverage restriction. (4/15/08 Tr. 114). The only permissible non-residential uses in the R-A zone in which RHI's property is located are churches and elementary schools. (4/17/08 Tr. 30). Ralph Grutzmacher, who was the drafter of CB–83–2003 and legislative officer for Prince George's County, testified that he was unaware of any other property in Councilman Dernoga's district that would have been affected by the terms of CB–83–2003. (4/22/08 Tr. 129).

---

**4.** CB–83–2003 means that this was the 83rd Council Bill during 2003.

## F. Denial of RHI's 2004 Subdivision Application

When land is proposed for subdivision that is in the Prince George's County portion of the regional district covered by the "Maryland–Washington Regional District Act," it must comply with subdivision ordinances adopted by the M–NCPPC. Md. Ann.Code art. 28, §§ 7–102, 7–111 (2003). The M–NCPPC is a bi-county agency created by the State in 1927 to prepare and administer a general plan for the physical development of Montgomery and Prince George's Counties. *Id.* § 1–101. The M–NCPPC consists of ten members, five of whom are appointed by Montgomery County and the other five are appointed by Prince George's County.[5] *Id.* § 2–101. The M–NCPPC coordinates and acts on matters of interest to both counties. The members of the M–NCPPC from each County serve as separate Planning Boards in their respective counties to facilitate, review, and administer the matters affecting their respective counties. *Id.* § 7–111(a).

The M–NCPPC and Planning Boards of the respective counties may prepare subdivision regulations and amendments governing the subdivision of land within the regional district or the respective portions of the regional district within Montgomery or Prince George's County. Md. Ann. Code art. 28, § 7–116(a). In Prince George's County, the M–NCPPC approves or disapproves a preliminary subdivision plan. *Id.* § 7–117.

When a proposed subdivision is located wholly within Prince George's County portion of the regional district governed by "Maryland–Washington Regional District Act," the affirmative vote of a majority of the members of the Prince George's County Planning Board is required.[6] *Id.* § 7–111. The Planning Board reviews preliminary subdivision plans to "ensure that adequate public facilities [such as water and sewer] are available, or will be available in the future, to serve the proposed development." Development Review Division, Prince George's County Planning Board, *at http://www.mncppc.org/drd.main.htm,* at *2 (last accessed Sept. 29, 2008). A subdivision application must also conform to the zoning requirements under the Prince George's County Code. Prince

---

5. The Prince George's County Planning Board is comprised of five members appointed by the Prince George's County Executive and approved by the Prince George's County Council. *Id.* § 2–101(a). The Montgomery County Planning Board is comprised of five members appointed by appointed by the County Council and approved by the County Executive. *Id.* § 2–101(a). The County Councils of Montgomery County and Prince George's County are each designated as the district council for their portion of the regional district respectively. *Id.* § 8–101(a). When they sit together as the bi-county district council for the entire Maryland–Washington Regional District, the adoption of an ordinance or resolution by them as the bi-county district council must be supported by affirmative votes of a majority of the membership of each County's district council. *Id.* At the direction of either of the respective County's district council, the M–NCPPC shall initi-

ate and adopt a general plan (and amendments thereto) for the development of that portion of the Maryland–Washington Regional District. *Id.* § 7–108(a). The M–NCPPC shall initiate and adopt local planning areas and local master plans that have been approved by each County's district council. *Id.* at (b).

6. While the M–NCPPC is concerned with regional planning functions that relate to or affect the regional district, the individual County Planning Boards "are responsible for planning, platting, and zoning functions primarily local in scope." *Id.* § 7–111(a). A local function exclusively within the jurisdiction of the respective Planning Boards is the administration of subdivision regulations. *Id.* The M–NCPPC is authorized to prepare, adopt, and amend the general plan for the physical development of the district. *Id.*

George's County, Md., Code § 24–121(a) (2003). The County's policy is that "[l]and to be subdivided shall of such character that it can be used safely for building purposes without danger to health, safety, and welfare." *Id.* § 24–103.

In determining whether to approve a subdivision plan, the Prince George's County Planning Board is required to evaluate whether location of the property within the service area of the water and sewerage plan is adequate for the proposed subdivision. *See id.* § 24–122.01(b)(1). The Board may also consult the Prince George's County Water and Sewer Plan, which designates each property with a Water and Sewer category that then determines the extent and type of development possible on the property. As explained earlier, category 3 (which includes categories 1 and 2) provides that the property currently uses, or is approved to use, the public water and sewer system. Category 4 provides that the property may transition administratively to category 3 if the applicant has obtained approval of its preliminary subdivision plan and has met other criteria. Category 5 property requires a redesignation to category 4 prior to the commencement of the development review process because it lacks access to the public water system. Category 6 property operates on private water and sewer systems and would require redesignation prior to initiation of the development review process for similar reasons.

Pastor Oxentenko met with M–NCPPC staff in November 2004 and with Judith Thatcher, who was Councilman Dernoga's assistant, in an effort to alleviate the concerns of the WLCA and Councilman Dernoga so that RHI's church could be built. (4/15/08 Tr. 114). Ms. Thatcher told him that Dernoga was opposed to RHI's church because Bethany Christian Church, which was located down the road, had a "negative impact in that community" and

that if [they] open[ed] the door for [RHI], [they were] going to have to open it for other [churches]," which would change the character of the community. (*Id.* at 115–17).

RHI developed and submitted a subdivision application on November 4, 2004, that provided for construction on 1.7 acres, which was only 10% of the Property's entire 17 acres; specifically, it would locate a church building of 14,000 square feet over three stories with parking around it on the front parcel. (*Id.* at 117–19). In order for the design to proceed, approval of a subdivision application to combine the front and rear parcels into one parcel was required. (*Id.* at 119).

The Prince George's County Planning Board heard RHI's subdivision application on April 7, 2005, and denied it. (Pl.'s Trial Ex. 20). The Board noted that M–NCPPC staff had recommended disapproval of RHI's application. (*Id.*) The Board explained that the Property exceeded the 10% lot coverage restriction because a portion of the Property was still in water and sewer category 5, which the Board believed could not be used in the calculation of the percentage of coverage based upon the recently adopted provisions of CB–83–2003. (*Id.*) After the Planning Board heard testimony on RHI's application but before final arguments (and before denying RHI's application), Board members took a recess and Mr. Shipley, who was RHI's counsel, observed Dernoga following them into a private room, which he testified was "highly unusual." (4/18/08 Tr. 32–33).

On May 25, 2003, RHI filed a petition for judicial review in the Circuit Court for Prince George's County seeking review of this denial. The Circuit Court affirmed the denial of RHI's application on May 3, 2006, and an appeal was taken to the Court of Special Appeals of Maryland on

May 19, 2006. In a decision issued on February 15, 2007, the Court of Special Appeals of Maryland affirmed the judgment of the Circuit Court.

### G. Denial of RHI's 2005 Water and Sewer Category Change Application

In response to M–NCPPC's rationale that the subdivision application was rejected because a portion of RHI's plan was in category 5 (which required a category change application), RHI submitted an application on July 9, 2005, seeking a water and sewer upgrade from category 5 to category 4. (Pl.'s Trial Ex. 22; 4/15/08 Tr. 121). The DER staff report contained many comments similar to those that it made regarding RHI's 2003 water and sewer category change application (i.e. nothing negative), there were no adverse comments, and WSSC estimated less sewage flow under this plan than the 2003 one and submitted a report that did not object to the application. (Pl.'s Trial Ex. 22; 4/17/08 156, 168). It appeared that RHI met the criteria for the category change because the treatment plant had capacity to accommodate the category change, the sewer line could be extended a few hundred yards at RHI's expense, and the development of the church conformed to the terms of the master plan and zoning. (4/17/08 Tr. 40).

To the surprise of RHI, Councilman Dernoga produced a letter from the WSSC at the hearing before the County Council, which purported to oppose RHI's application (even though the WSSC's prior report stated that the WSSC did not object to it). (Defs.' Trial Ex. 33; 4/17/08 Tr. 44). The County Council then voted to deny RHI's application. Of the twenty-five applications that the County Council reviewed at the meeting, all were approved except for the one submitted by RHI. Similarly to what happened in 2003, RHI's application was the only one that the County Executive recommended for approval but which was denied by the County Council. (Pl.'s Trial Ex. 24; 4/15/08 Tr. 124). There were three applications in which the County Executive recommended denial, but the County Council approved all of them. (4/15/08 Tr. 125–26). Again, RHI's was the only application that sought a religious land use; the others that were approved sought commercial or residential land uses. (Id.; Pl.'s Trial Ex. 24).

Following this denial, Mr. Shipley advised RHI that it was wasting its time and money in attempting to proceed with the County. (4/18/08 Tr. 42). RHI has been unable to do anything with the Property since it acquired it. (4/15/08 Tr. 126). In fact, the house that sat on the Property, which was used occasionally for meetings, burned down. (Id.). Due to the denials of its water and sewer category change applications, the enactment of CB–83–2003, and the denial of its subdivision application, RHI is unable to build a church, school, or other facilities on the percentage of lot coverage on which it would be permitted to build absent any water and sewer category changes. (Id. at 135). To date, RHI has invested hundreds of thousands of dollars in its attempts to build a church on the Property to no avail. (4/15/08 Tr. 135). RHI intended on completing the first phase of construction so that it could occupy the church by the end of 2004, which has not happened. (4/16/08 Tr. 172). The balloon payment on RHI's mortgage for the land loan has been extended to March 31, 2009 and is over $500,000; currently, RHI lacks the funding to make the payment at that time. (Id. at 168–72). If RHI does not make the balloon payment, the seller has the right to foreclose on the Property. (Id. at 172).

### H. The Complaint in this Court

On June 22, 2005, RHI filed a three count Complaint in this Court against

Prince George's County and the County Council.[7] (Paper No. 1). Count I asserted a claim for violation of the Equal Protection Clause of the Fourteenth Amendment based on discrimination against it as a religious institution, and Count III asserted a claim for violation of RLUIPA.[8] The Complaint was filed after the Circuit Court for Prince George's County denied RHI's mandamus petition relating to the denial of the 2003 water and sewer category change application (but before decision of the appeal therefrom) and after denial of RHI's 2004 subdivision application, but before decision of the petition for judicial review of the denial by the Circuit Court for Prince George's County and the later appeal.

Defendant filed a Motion for Summary Judgment (Paper No. 35) on October 12, 2006, which the Court denied following a hearing on April 30, 2007. (Paper No. 42). A seven-day jury trial was held beginning on April 15, 2008.

At the conclusion of the trial, the jury made special findings that the Defendant's laws, regulations or administrative actions (1) were motivated, at least in part, on the basis of religious discrimination and (2) imposed a substantial burden on RHI's exercise of religion. The jury was advised that, if they made either one of these findings, the Court would then have to make a determination as to whether the Defendant had met certain burdens, but that if the Court were to conclude that the Defendant had not met them, the jury should make a provisional award of damages. The jury's verdict made a provisional award of $3,714,822.36. The parties were then permitted to submit supplemental briefing and the Defendant also filed a

Renewed Motion for Judgment as a Matter of Law.

In Defendant's Renewed Motion for Judgment as a Matter of Law, it contends that the jury's two findings were not supported by legally sufficient evidence and that the Court should also find as a legal matter that Defendant's actions serve compelling governmental purposes and that its actions were narrowly tailored to serve those compelling governmental purposes.

## STANDARD OF REVIEW

Under Rule 50 of the Federal Rules of Civil Procedure, the Court may grant a motion for judgment as a matter of law only if there was not any legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. *Willis v. Youngblood*, 384 F.Supp.2d 883, 886 (D.Md.2005). The Court must view the evidence in the light most favorable to the nonmoving party, who also receives the benefit of all inferences that may be drawn in its favor. *Id.* The Court should not "disturb a jury verdict unless without weighing the evidence or assessing witness credibility, [it] conclude[s] that reasonable people could have returned a verdict only for the moving party." *Randall v. Prince George's County, Md.*, 302 F.3d 188, 201 (4th Cir.2002) (internal quotation marks and citation omitted).

## *ANALYSIS*

### A. The Merits: Equal Protection & The Religious Land Use and Institutionalized Persons Act ("RLUIPA")

According to RHI, Defendant engaged in a pattern of conduct that was motivated by religious discrimination, and that it

---

7. The County and the County Council are collectively referred to in this opinion as "the Defendant."

8. Count II (Violation of Equal Protection Clause: Race) was abandoned at trial by the Plaintiff.

thereby violated the Equal Protection Clause of the Fourteenth Amendment, and violated RLUIPA. RHI seeks as relief an injunction against enforcement of CB–83–2003, a declaration that the ordinance is void, and damages. The Defendant denies that RHI is entitled to any relief, and renews its Motion for Judgment as a Matter of Law.

### 1. The Jury's Finding of Intentional Discrimination under the Equal Protection Clause

█ To demonstrate an Equal Protection claim successfully in the Fourth Circuit, a plaintiff must show intentional or purposeful discrimination; it is not enough to prove that a benefit was denied to one party while conferred on another. *Sylvia Dev. Corp. v. Calvert County, Md.,* 48 F.3d 810, 819 (4th Cir.1995). This discrimination can be demonstrated through a facially discriminatory act, or by providing extrinsic evidence such that a discriminatory system designed to favor one class over another can be inferred from the circumstances. *Id.*

█ The Fourth Circuit has recognized several factors that are probative of whether a decision-making body was motivated by discriminating intent, and they were included in the jury instructions: (1) evidence of a 'consistent pattern' of actions by the decision-making body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decision-making body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decision-makers on the record or in minutes of their meetings.

(Paper No. 89; 4/23/08 Trial Tr. 35–38); *see also Sylvia Dev. Corp.,* 48 F.3d at 819 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). If a fundamental right or suspect classification is at issue, the burden shifts to Defendant to articulate a compelling governmental interest and that its actions taken were narrowly tailored to further that compelling governmental interest.[9] *Id.* Because CB–83–2003 is a facially neutral ordinance, RHI bears the burden of demonstrating an intent on the part of the Defendant to purposefully discriminate against it. *Sylvia Dev. Corp.,* 48 F.3d at 819.

█ Here, the jury found as a factual matter that Defendant's actions against RHI were motivated, at least in part, on the basis of religious discrimination[10] in violation of the Equal Protection Clause. In its Renewed Motion for Judgment as a Matter of Law, Defendant contends that the jury's verdict lacked a legally sufficient basis. To the contrary, the historical background, the specific sequence of events leading up to the Defendant's ac-

---

**9.** Defendant contends that rational basis review is the appropriate standard and that RHI has failed to carry its burden of demonstrating a prima facie case of discrimination under the Equal Protection Clause because RHI has not adduced evidence of disparate treatment compared to "similarly situated" entities. Both contentions are incorrect. Religion is an inherently suspect classification *and* the free exercise of religion is a fundamental right—either of which would entitle RHI to strict scrutiny review. *See Johnson v. Robison,* 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). (holding that First Amendment free exercise is fundamental right); *Roller v. Gunn,* 107 F.3d 227, 233 (4th Cir.1997) (holding that religion is a suspect classification).

**10.** As noted above, RHI abandoned its race-based discrimination claim in Count II under the Equal Protection Clause prior to trial.

tions (including numerous departures from normal procedures), and the contemporary statements of decision-makers all amply support the jury's reasonable finding of intentional discrimination.

The Defendant's denial of RHI's 2003 water and sewer category change application supports an inference of intentional discrimination. The reviewing governmental agencies and the County Executive recommended approval, there was nothing in RHI's plan that violated any regulations that would have precluded approval, there was no adverse testimony or questions or comments from the Council Members at the hearing on RHI's application, and the Council initially voted to approve the application. (4/17/08 Trial Tr. 106–08, 119–20, 138, 155–57). In the moments after the Council's initial approval, however, Councilman Dernoga was observed to have said something to the Council, which then voted to reject it, which was something that Carl Kent, a witness who had worked in the construction business for over 27 years had never seen. (4/16/08 Trial Tr. 119–20). RHI's application was the only proposal rejected out of the 28 presented and was the only one that proposed the building of a church (as opposed to a residential or commercial development). (Pl.'s Trial Exs. 8 & 11).

Notably, at that same hearing, the Council approved the water and sewer category change application for Dugan's Estates, which was situated on the same side of the road as the RHI property (and thus adjacent to the Rocky Gorge Reservoir) and requested an *identical* category change (i.e. an upgrade from category 5 to 4) even though Dugan's Estates was traversed by a stream that drained directly into Rocky Gorge Reservoir—a fact that Defendant conceded at trial raised a environmental concern—while the RHI property was not. (4/15/08 Trial Tr. 109–10, 129–32; Pl.'s Ex. 11). The fair and rea-

sonable inference to be drawn from this sequence of events leading up to the denial of the 2003 category change application is that (1) Dernoga said something that led the Council to vote against RHI's application and, based on the testimony concerning statements by Dernoga's personal assistant (Judith Thatcher) that (2) Dernoga did not want a church to be built on RHI's property due to the "[v]ery hostile" reaction of the West Laurel Community Association, which did not want another church application to be approved given the existence of another church, which the WLCA viewed as problematic, in that neighborhood. (4/15/08 Trial Tr. 115–17; 4/16/08 Trial Tr. 115–16).

The statements that Prince George's County Council members made to the press also support the inference that religion-based public sentiment was opposed to RHI's application. County Council Chairman Samuel Dean was quoted in a Washington Post article dated March 14, 2005, as saying that "[the Council] do[es]n't oppose churches, the concern we have is that sometimes churches eat up a lot of land that could be used for other things." *See* (Pl.'s Trial Ex. 27; 4/16/08 Tr. 24). To clarify the "other things" the Council was concerned about protecting, Council Member Camille Exum explained that "we are losing tax money and retail and increasingly, churches are requiring more space." (*Id.*) Finally, Council Member David Harrington noted that "[w]hat I hear from residents is that they don't feel like these churches are being an asset to the community." (*Id.*)

Though Defendant challenges the admission of these three statements because "there was no evidence presented by [RHI] that *any* Council Member made contemporaneous statements on the record or in the minutes of Council meetings with regard to [RHI's] filing of its 2003 applica-

tion, the enactment of [CB–83–2003], the 2004 subdivision application, and/or the 2005 application," it defies logic, human nature, and case law to suggest that these statements made *during* the period of time when County Council members were alleged to have engaged in a discriminatory pattern of conduct are irrelevant to the Court's inquiry. Indeed, while these are not "statements on the record or in the minutes of [the decision-makers'] meetings," there is no dispute that these are statements of the relevant decision-makers during the precise time period *after* RHI's 2003 application had been denied and CB–83–2003 had been enacted as well as *immediately preceding* the RHI's applications for subdivision and another water and sewer category change. *See Sylvia Dev. Corp.*, 48 F.3d at 819 (citing *Vill. of Arlington Heights*, 429 U.S. at 268, 97 S.Ct. 555).

Surely, the jury could reasonably infer—given the wealth of other evidence presented at trial—that County Council members who held these views approximately a year and a half *after* denying RHI's 2003 water and sewer category change application and enacting CB–83–2003 harbored these views in the subsequent several months in which they denied the 2005 water and sewer category change application. *See Helping Hand, LLC v. Baltimore County, Md.*, 295 F.Supp.2d 585, 591 (D.Md.2003) (holding that a council member's media statements "may be evidence of the Council's intentions").

A reasonable inference of discrimination is further supported by the sequence of events leading up to the enactment of CB–83–2003, which effectively foreclosed RHI's ability to build a church on its property.[11] Councilman Dernoga (the bill's sponsor) introduced it barely two months after the Council denied RHI's water and sewer category change application, meaning that the bill was drafted almost immediately after the denial of RHI's application and, a jury might reasonably infer, in response to it.[12] (Pl.'s Ex. 16; 4/15/08 Trial Tr. 110–14; 4/22/08 Trial Tr. 69, 121; Defs.' Ex. 21; Pl.'s Trial Ex. 2). The restriction contained in the bill was just large enough to encompass all of RHI's property and, even the drafter of the bill testified that he did not know of any other property in that district (i.e. Councilman Dernoga's district) that would have been impacted by the bill other than the property of RHI. (4/22/08 Trial Tr. 128–29).

The inference that RHI was uniquely targeted by this bill is buttressed by the inconsistency in the purported motivation for the bill and the reality of its drafting: although Councilman Dernoga stated that the purpose of the bill was to achieve consistency with the lot coverage policy in Montgomery County (with lands that also drain into the Rocky Gorge Reservoir), the drafter of the bill (Mr. Grutzmacher) conceded at trial that he did not examine similar legislation in Montgomery or Howard Counties prior to drafting CB–83–2003, even though both counties have lands contiguous to the Rocky Gorge Reservoir and account for 99% of the drainage into the Patuxent Reservoirs (which include the Rocky Gorge Reservoir) and even though he normally would review what other coun-

---

11. CB–83–2003 reduces the net lot coverage (i.e. covered impervious surfaces such as buildings, parking spaces, and roads) for certain non-residential uses in residential zones from 50% and 60% to 10% and 20% for properties that are located within 2,500 feet of a drinking water reservoir. (Pl.'s Ex. 16; 4/17/08 Trial Tr. 31).

12. RHI's 2003 water and sewer category change application was denied at the Council's July 29, 2003 meeting and Dernoga introduced CB–83–2003 on September 30, 2003. (Def.'s Trial Ex. 13).

ties have done or are currently doing, and that he did not read the environmental guidelines from Montgomery County. (Pl.'s Ex. 16 at 45, 49–50; 4/15/08 Trial Tr. 110–14; 4/16/08 Trial Tr. 51; 4/22/08 Trial Tr. 69, 121, 124; Defs.' Ex. 65 p. 15).

Similarly, the sequence of events leading up to the denial of RHI's application to subdivide its property also support an inference of intentional discrimination. Much like the 2003 water and sewer category change application, while the Prince George's County Planning Board considered RHI's 2004 subdivision application, Councilman Dernoga recessed with M–NCPPC members behind closed doors (a move characterized as "highly unusual" by an attendee with 49 years of experience in land use law) shortly before it announced its decision to reject RHI's application based largely on the new restrictions imposed by CB–83–2003. (4/18/08 Trial Tr. 32–33).

When the Council denied RHI's 2005 water and sewer category change application, RHI's application had *again* been recommended for approval by all governmental agencies and the County Executive, but *again* its application was the only one that was denied and was the only application that was for a religious entity. (Pl.'s Ex. 22; 4/15/08 Trial Tr. 122–26; 4/17/08 Trial Tr. 156, 162–63, 168). Further supporting a reasonable inference of intentional discrimination is the Council's acceptance of *ex parte* documents presented in opposition to RHI's application (by Councilman Dernoga no less), which was unusual, and its refusal to accept such *ex parte* documents in support of RHI's application. (4/17/08 Trial Tr. 38–39, 44–47, 69, 170; Defs.' Ex. 33, Pl.'s Ex. 13).

Finally, witnesses who had worked in land development in the County for a number of years and familiar with the land use application and approval processes testified that they expected that RHI's application would get through the land use process and result in the construction of the proposed churched and were surprised that this did not occur. (4/16/08 Trial Tr. 41, 120, 160; 4/18/08 Trial Tr. 44).

As here, it is not common for land use decision-makers to expressly offer religion as their reason to exclude a church. As noted by Senators Hatch and Kennedy, "[m]ore often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan,'" and unfortunately these "forms of discrimination are very widespread." 146 Cong. Rec. at S7774–S7775 (joint statement of Senators Hatch and Kennedy on the Religious Land Use and Institutionalized Persons Act of 2000). Here, a jury reasonably concluded that religious discrimination was afoot, and this Court sees no reason to disturb that finding.

In conclusion, it is clear that Defendant engaged RHI in a fruitless three-year-long shadowboxing match that was doomed from the start. Certainly, Defendant never leveled a knockout punch with one decision or action over the course of the three years in which RHI presented applications to build its church in conformity with the applicable laws at the time. Yet the jury was presented with legally sufficient evidence during trial of Defendant's combination of uppercuts, hooks, crosses, and jabs coupled with Defendant's bobbing and weaving, which ensured that RHI was always facing a moving target without ever having the time or opportunity to recover or any hope for success.

### 2. The Jury's Finding of Substantial Burden under RLUIPA

■ RLUIPA states that:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the

religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

> (A) is in furtherance of a compelling governmental interest; and

> (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc. In this case, RLUIPA applies because RHI alleges that the County has imposed a substantial burden on the ability of RHI, a religious institution, to exercise its religion.[13] A plaintiff under RLUIPA bears the burden of presenting a prima facie case that the challenged land use regulation imposes a "substantial burden" on its religious exercise. *Id.* § 2000cc–2(b). RLUIPA does not define the term "substantial burden." *Id.*

Here, the jury found as a factual matter that Defendant's actions did impose a "substantial burden" on RHI's religious exercise. In its Renewed Motion for Judgment as a Matter of Law, Defendant contends that the jury's verdict lacked a legally sufficient basis. This contention is also without merit.

Although the term "substantial burden" is not defined in RLUIPA, the Fourth Circuit has defined it in accordance with

Free Exercise Clause jurisprudence as "when a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). This is consistent with the jury instructions given at trial and Maryland's case law interpreting RLUIPA.[14] *See* Doc. 89—Jury Instructions at 118–20; *Trinity Assembly of God of Baltimore City, Inc. v. People's Counsel for Baltimore County*, 178 Md.App. 232, 941 A.2d 560, 574 (2008).

The jury heard testimony that the Defendant's denials of RHI's water and sewer category change applications in 2003 and 2005 prevented RHI from building its church or church school anywhere on the rear portion of its property (i.e. on 10 out of the 17 total acres) and that the enactment of CB–83–2003 foreclosed RHI's ability to build on the front 7–acre parcel and restricted development to 10% lot coverage within 2,500 feet of a water reservoir. (4/15/08 Trial Tr. 134; 4/16/08 Trial Tr. 59, 123; 4/17/08 Trial Tr. 6; Pl.'s Ex. 16). The jury heard evidence at trial that Defendant's actions resulted in the limitation on RHI to use only 0.7 acres out of its 17–acre parcel to construct its church, school, parking lots, parking spaces, driveways,

---

**13.** Defendant has not disputed the application of RLUIPA to RHI's application to build a church. In any event, RLUIPA applies to this case given its broad definition of "religious exercise" and its corresponding broad application. Under RLUIPA, "the use, building, or conversion of real property for the purpose of religious exercise is a religious exercise of the person that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc–5(7)(B).

**14.** The Fourth Circuit's definition is also consistent with that of its sister circuits. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 349 (2d Cir.2007) ("burden need not be found insuperable to be substan-

tial"); *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (substantial burden "must impose significantly great restriction or onus upon such exercise"); *Midrash Sephardi Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir.2004) (substantial burden is "pressure that tends to force adherents to forego religious precepts or ... mandates religious conduct"); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir.2003) (substantial burden "is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise-including the use of real property for the purpose thereof within the regulated jurisdiction generally-effectively impracticable").

and sidewalks, which was insufficient to build the church alone—much less any of the other structures that RHI's current congregation requires. (4/15/08 Trial Tr. 134–35, 139, 177; 4/16/08 Trial Tr. 59, 123, 170); *see Mintz v. Roman Catholic Bishop of Springfield,* 424 F.Supp.2d 309, 319–323 (D.Mass.2006) (holding that the denial of the church's permit to build a parish center next to existing church would substantially burden the religious exercise of the congregation). Despite Defendant's argument that a limitation on the size of a proposed construction project is not a substantial burden, the cases to which Defendant cites are readily distinguishable because the plaintiff religious organizations in those cases had existing facilities and sought to expand while RHI has *no* facilities of its own. *Cf. Living Water Church of God v. Charter Township of Meridian,* 258 Fed.Appx. 729, 738–39 (6th Cir.2007) (holding that denial of church's application to build a gymnasium adjacent to existing worship facilities was not a substantial burden under RLUIPA because the gymnasium was unrelated to religious worship and the church could expand its worship space by another 14,000 feet without restriction).

Moreover, RHI presented evidence of how Defendant's actions led to RHI's expenditure of substantial funds and resulted in delay and uncertainty—circumstances that also qualify as a substantial burden under RLUIPA. Here, RHI invested hundreds of thousands of dollars in the application processes and purchased the parcel of land with the expectation that it would be able to build on it, finance construction, occupy the parcel by the end of 2004, and then obtain a permanent loan to pay off its land loan, expectations that were reasonable given the then-current state of the law and the track record of the agencies that would be reviewing its application. "Once the organization has bought property reasonably expecting to obtain a permit, the denial of the permit may inflict a hardship upon it." *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895, 898–900 (7th Cir.2005) (holding that substantial burden existed on church whose zoning variance was denied because it "faced the possibility of having to sell its land and finding an alternative piece of land or the possibility of being subject to unreasonable delay in restarting its application for a variance," when doing so would have led to "delay, uncertainty, and expense"). But due to the delay and uncertainty in the application process, RHI sought an extension of its land loan to March 31, 2009, at which time a balloon payment of over $500,000 is due that RHI doubts it will be able to afford rendering the property vulnerable to foreclosure. (4/15/08 Trial Tr. 135, 168–72); *see Grace Church of North County v. City of San Diego,* 555 F.Supp.2d 1126, 1136–38 (S.D.Cal.2008) (holding that church's substantial uncertainty about its future was a "present and very real burden" on its "religious exercise" because it had no reasonable expectation of extension of its conditional use permit and the church had already expended a significant amount of money in the application process).

Despite Defendant's contention that RHI's religious exercise was not substantially burdened because RHI was leasing the Cedar Ridge facilities, the jury heard evidence explaining why and how Cedar Ridge was insufficient for RHI's needs and that the temporary and limited use of the leased Cedar Ridge facilities for RHI's religious exercise placed substantial pressure on RHI to violate or choose between its religious beliefs. Specifically, Cedar Ridge prevented RHI from engaging in typical Seventh Day Adventist practices. Cedar Ridge is not large enough to accommodate RHI's congregation (thereby stifling RHI's religious mission to grow its

congregation), RHI could not construct a religious school in which to teach the precepts of its religion, RHI members were required to set up for religious services in violation of their religious dictates (i.e. not working on the Sabbath), the landlord possessed an ability to terminate RHI's lease (thereby leading to uncertainty), and RHI could not hold numerous religious activities (i.e. baptisms, weddings, funerals, etc.), all of which were integral to RHI's exercise of its religious precepts. (4/15/08 Trial Tr. 79–89); *see Cottonwood Christian Ctr. v. Cypress Redev. Agency,* 218 F.Supp.2d 1203, 1226–28 (C.D.Cal.2002) (holding that substantial burden existed because church was unable to practice its religious beliefs in its current location and that if plaintiff "could not build a church, it could not exist" as "numerous religious services cannot be performed" and thus there was a "religious need to have a large and multi-faceted church").[15] Defendant's cases are likewise inapposite because they examine expansion of existing facilities and not the wholesale denial of a main worship site, which infringes upon plaintiff's rights.[16] *See Living Water Church of God,* 258 Fed.Appx. at 738–39 (holding that denial of church's application to build a gymnasium was not substantial burden under RLUIPA given existing religious worship facility).

The special verdicts of the jury being amply supported by the evidence, the Defendant's Renewed Motion for Judgment as a Matter of Law will be denied.

### 3. Strict Scrutiny Review under the Equal Protection Clause and RLUIPA

 Under the Equal Protection Clause and RLUIPA, once the plaintiff has met its burden of demonstrating a prima facie case, the burden shifts to the defendant to articulate and prove that it had a compelling interest and the actions taken were the least restrictive means of furthering that compelling interest. *Sylvia Dev. Corp.,* 48 F.3d at 819; 42 U.S.C. § 2000CC–2(b). The verdict of the jury establishes that such a case has been made, and now the Defendant must meet its burden.

#### a) Compelling Interest

Each of Defendant's articulated compelling interests is addressed in turn below.

#### i) Denial of the water and sewer category change applications in 2003 and 2005

Defendant contends that its denials of RHI's water and sewer category change applications in 2003 and 2005 were based upon three compelling interests: 1) the

---

**15.** This is also supported by the legislative history of RLUIPA:

The right to build, buy or rent [physical] space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes.... Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation. Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes. Or the codes permit churches only with

individualized permission from the zoning board, and zoning boards use that authority in discriminatory ways.

146 Cong. Rec. S7774, S7775 (joint statement of Senators Hatch and Kennedy on the Religious Land Use and Institutionalized Persons Act of 2000).

**16.** Defendant also misstates the holding of *Westchester Day Sch. v. Vill. of Mamaroneck* as holding that a substantial burden did not exist when, in fact, the Second Circuit held exactly the opposite: namely, that the zoning board's denial of the church's application to expand its religious school was a substantial burden on its religious exercise. 504 F.3d at 349.

protection of Rocky Gorge Reservoir, which was adjacent to RHI's property; 2) desire to maintain the character of the neighborhood, which was mainly large-lot residential developments; and 3) concern that RHI's construction would lead to a greater impervious surface area that would have a negative impact on the water quality. Based upon the evidence adduced at trial, each of Defendant's reasons fails as a compelling interest.

A "compelling interest" is not a general interest but must be particular to a specific case; namely, the interest requires the infringement of a particular right in this case due to an interest of the highest order. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

First, the Defendant's interest in "protecting [Rocky Gorge Reservoir,] the County's largest source of drinking water for its residents" from an alleged negative impact of RHI's construction and increase in impervious surface area is completely undermined by the evidence adduced at trial. Significantly, Defendant did not adduce *any* evidence at trial that demonstrated that an approval of any of RHI's applications would have *any* impact—much less a negative impact—on Rocky Gorge Reservoir. Defendant did not produce any data, studies, or reports on this issue.

Moreover, Defendant has not carried its burden in demonstrating how the impact on Rocky Gorge Reservoir would be of a different kind and/or degree than the impact on the Reservoir from the surrounding large-lot residential developments or from Dugan's Estates, which had its water and sewer category change application approved despite the fact that it was traversed by a stream that ran off directly into the reservoir. Protection of the reservoir as a compelling interest is further undermined by Defendant's concession at trial that the stream run-off from Dugan's Estates was an "environmental concern" yet Defendant approved that residential category change application. *See City of Hialeah,* 508 U.S. at 544–47, 113 S.Ct. 2217 (holding that law prohibiting the religious sacrifice could not be regarded as serving a compelling interest when it left "appreciable damage to that supposedly vital interest unprohibited" when it permitted the unregulated slaughter of animals in a variety of other contexts such as hunting and extermination, which undermined the government's assertion that the compelling interest was the prevention of cruelty of animals and the health risk posed by the improper disposal of animal carcasses).

Finally, it is noteworthy that the M–NCPPC, DER, and WSSC (initially) all recommended or did not object to RHI's category change applications, lending further support to the notion that the governmental bodies charged with and familiar with the County's environmental policies did not perceive any negative environmentally-based reasons upon which to deny RHI's applications and supports the inference that Defendant's proffered reasons are pretextual, and certainly not compelling.[17] *See Miller v. Brown,* 503 F.3d 360, 370 (4th Cir.2007) (holding that government's "speculation [did] not establish a compelling interest" when government articulated only "doubts" and "serious questions" about plaintiff's actions in the absence of extrinsic evi-

---

17. Defendant also misstates the burden under RLUIPA. It argues that RHI did not present evidence that a lesser (i.e. 1,320 foot) setback would not affect the whole property. This, however, is the incorrect inquiry as the burden shifted to Defendant to articulate why its interests were sufficiently compelling to infringe upon RHI's rights. 42 U.S.C. § 2000cc–2(b).

dence); *see also Wisconsin v. Yoder,* 406 U.S. 205, 224–25, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (holding that the government must present "specific evidence" of the alleged compelling interests and how those interests were advanced by the government's actions in order to carry its burden under strict scrutiny review).

### ii) Enactment of CB–83–2003

Defendant contends that CB–83–2003 was enacted to comply with the Clean Water Act by reducing the permissible lot coverage and increasing the green area within 2,500 feet of drinking water reservoirs, such as the Rocky Gorge Reservoir. Once again, however, this does not constitute a compelling interest.

First, Defendant's expert Dr. Shoemaker testified that she had no knowledge of RHI's plans and conceded that even if RHI was prevented from building due to these concerns, RHI's site was part of the larger collective site such that environmental impact should be focused on the aggregate collective.

Second, the fact that Montgomery County, which accounts for 46% of the drainage into Rocky Gorge Reservoir (as compared to only 1 % of the drainage by Prince George's County), has a 1,320 foot limit instead of CB–83–2003's 2,500 limit, undermines Defendant's assertion of a compelling interest because Defendant has not adduced any evidence as to why a *greater* limit was necessary in Prince George's County, which accounts for a *de minimis* amount of drainage. Defendant's assertion that CB–83–2003 was enacted to provide or maintain consistency with Montgomery and Howard counties is also belied by Mr. Grutzmacher's testimony at trial that he did not even examine their policies, much less use them to tailor the more restrictive policy he drafted for Prince George's County.

### b) Least Restrictive Means

Even if the Court were to find that Defendant's actions served compelling governmental interests (which the Court finds that they do not), Defendant has still failed to carry its burden because its actions were not the least restrictive means of furthering any alleged compelling interests.

As a threshold matter, it is difficult for Defendant to argue that its actions were the least restrictive means to achieve its compelling interests because Defendant did not commission, examine, or adduce any evidence at trial in the form of data, studies, or reports indicating what (if any) impact RHI's water and sewer category change applications or subdivision proposal would have on Rocky Gorge Reservoir. This absence of qualitative and quantitative evidence on Defendant's part undermines any assertion that it fully and adequately considered any alternatives to its outright denials of RHI's 2003 and 2005 applications and the passage of CB–83–2003.

Furthermore, the disparity between the amount of drainage and corresponding lot coverage restriction between Montgomery and Prince George's Counties also weakens Defendant's contention—and proof—that it employed the least restrictive means. Montgomery County accounts for significantly more of the drainage into Rocky Gorge Reservoir (46% compared to Prince George's County 1%) *yet* Montgomery County has a lesser coverage restriction (1,320 feet compared to Prince George's County's 2,500 feet under CB–83–2003). *See Shakur v. Schriro,* 514 F.3d 878, 890–91 (9th Cir.2008) (holding that another government body's ability to accommodate a religious exercise with a less restrictive practice supported plaintiff's argument under RLUIPA that defendant government failed to demonstrate that it

considered and used the least restrictive means to achieve its alleged compelling interest).

Despite Defendant's assertion that CB–83–2003 was based upon research into what other counties were doing and subsequent discussion regarding alternatives and how to tailor those approaches to the needs of Prince George's County, the trial record is devoid of any such evidence. To the contrary, Mr. Grutzmacher, who was the drafter of CB–83–2003, testified that, unlike other pieces of legislation that he had drafted for the County Council, he did not research or discuss what other counties were doing prior to drafting CB–83–2003. The fact that CB–83–2003 appears to have been drafted in a vacuum without regard to the exploration of approaches by other counties undermines Defendant's contention that it explored any alternatives—much less the least restrictive means—available to meet its purported compelling interests. The trial record is devoid of any evidence that Defendant ever considered a lesser lot coverage restriction or other method for achieving its goals.

Defendant also contends that CB–83–2003's 2,500 foot lot coverage restriction was based upon a provision in COMAR 26.04.02.04, which governed the County's Plan. Defendant contends that this supports the finding that CB–83–2003 was the least restrictive means. COMAR 26.04.02.04, however, does not regulate concerns about impervious surface runoff into drinking water reservoirs (the subject of CB–83–2003); rather, it regulates sewage disposal for homes and other establishments in circumstances where a public sewage system is not available and thus is wholly inapposite.

Finally, Defendant fails to address the testimony of its own agricultural engineering expert Dr. Leslie Shoemaker that various methods existed to purify and mitigate any impacts on water quality due to any water runoff concerns from RHI's proposed plans (and the corresponding impervious surfaces, which could contribute to water runoff concerns). (4/18/08 Tr. 65–67). The examples she provided—which Defendant did not adduce any evidence that it had even considered—included carbon systems to filter the run off, reverse osmosis systems "that actually sort of distill out almost anything that's within the water column," and nutrient management plans. *Id.* Defendant adduced nothing in the trial record as to why or how these mitigation measures would be inadequate to address its environmental concerns about RHI's building plans.

It is also significant to note that the latest plan that RHI presented at trial was located closer to the front portion of the front parcel, thereby increasing the distance between the impervious surfaces and the reservoir, which would minimize any impact on the reservoir. Dr. Shoemaker herself noted that "the further away from the reservoir the loadings are, the further away from a major stream systems the loadings are, the less impact they have on the downstream reservoir. So, there is a kind of dampening effect as you move further and further away." (*Id.* at 85).

This Court, therefore, concludes that the Defendant has failed to demonstrate a compelling interest for its actions or that its actions were the least restrictive means of furthering any such interest. Accordingly, this Court will now address the relief to which RHI is entitled.

## B. Relief

As redress for Defendant's violation of RLUIPA and the Equal Protection Clause, RHI seeks declaratory, injunctive, compensatory, and punitive relief. RLUIPA provides that "a person may assert a violation of this chapter as a claim or defense in

a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). It is readily apparent that declaratory and injunctive relief are "appropriate relief." *See Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (holding the loss of First Amendment freedoms "for even a minimal period of time unquestionably constitutes irreparable injury"); *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.").

### 1. Monetary Damages

In this case, the jury found that RHI was entitled to compensatory damages in the amount of $3,714,822.36. Though Defendant contends that the jury's verdict was unsupported, the precision of the jury's calculation of damages demonstrated that the jury carefully considered the evidence of damages that RHI presented at trial. The jury did not adopt wholesale RHI's requested amount of damages of $4,604,484.86; instead, the jury considered and disregarded a portion of the damages based upon the itemization of expenses, fees, and estimates provided in the exhibits produced at trial. *See* (Pl.'s Trial Ex. 27). Accordingly, judgment will be entered on the jury's provisional award of damages.

### 2. Injunctive Relief
### a) Threshold Issues: Waiver, Standing, Jurisdiction, and Abstention

As a threshold matter, Defendant contends that RHI is not entitled to injunctive relief under theories of waiver, standing, jurisdiction, and application of the doctrines of res judicata and collateral estoppel. All of Defendant's contentions lack merit.

First, Defendant's argument that RHI waived its right to injunctive relief due to a time-bar under Rule 50 and/or lack of inclusion in the parties' Pretrial Order is without merit. Rule 50 sets the time for the *movant* to file a Rule 50 motion and does not contain *any* time requirement for the nonmovant (i.e. RHI). *See* Fed. R.Civ.P. 50 ("[N]o later than 10 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law"). Defendant timely filed its renewed motion for judgment as a matter of law within the ten-day period after the jury discharged and RHI timely filed its Opposition. RHI complied with any and all time requirements and has not waived its right to injunctive relief. Further, the parties' Pretrial Order demonstrates that a request for injunctive relief was included therein. *See* (Joint Pretrial Order ¶ G).

Second, Defendant's contention that RHI lacks standing "because even if the Plaintiff is successful in challenging the ordinance in question, they can not get the underlying relief sought and therefore, [RHI is] unable to demonstrate that its injury will be redressed by enjoining CB–83–2003" lacks merit. *See* (Defs.' Reply to Pl.'s Opp. To Defs.' Renewed Mot. For J. at 4). RHI clearly has satisfied these requirements because: (1) it has suffered an injury in fact (inability to build a church and related structures on the Property, infringement of its rights under the Equal Protection Clause and RLUIPA, monetary damages from its expenditures on fruitless applications, *inter alia* ) that is (2) causally connected and fairly traceable to Defendant's conduct which (3) is capable of redress by enjoining the application of CB–83–2003 and ordering the Defendant to review RHI's water and sewer category change application for its latest plan without any regard to the provisions of CB–83–2003 and without discriminatory animus. *See Lujan v. Defenders of Wildlife,* 504

U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that the three elements of standing are injury in fact, causal connection, and redressability).

Third, Defendant argues that the doctrines of res judicata, collateral estoppel, and abstention (*Burford, Pullman, Younger, Rooker–Feldman*) preclude the Court's review and award of injunctive relief. The Court has already considered and rejected these arguments in its denial of Defendant's Motion to Dismiss and Motion for Summary Judgment. *See* (Dec. 6, 2005, Order; May 1, 2007 Order).

██ The Supreme Court has instructed that "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). Therefore, abstention doctrines constitute "extraordinary and narrow exception[s]" to a federal court's duty to exercise the jurisdiction conferred on it. *Id.* at 728, 116 S.Ct. 1712. These exceptions require the denial of discretionary relief when "principles of federalism and comity" outweigh the federal interest in deciding a case. *Id.*

██ The *Burford*[18] abstention doctrine " 'justif[ies] the dismissal of a federal action' in a 'narrow range of circumstances' when federal adjudication would 'unduly intrude' upon 'complex state administrative processes' because there exist (1) 'difficult questions of state law ... whose importance transcends the result in the case then at bar' or (2) federal review would disrupt 'state efforts to establish a coherent policy with respect to a matter of substantial public concern.' " *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir.2007) (internal citations omitted). The Supreme Court has admonished that a federal court may dismiss a case under *Burford* abstention only when presented with one of these "extraordinary circumstances." *Quackenbush*, 517 U.S. at 726–27, 116 S.Ct. 1712. The balance between the state's interest in resolving difficult questions of state law or uniformity and the federal interest in adjudicating the case at bar "only rarely favors abstention." *Id.* at 728, 116 S.Ct. 1712.

██ *Burford* abstention does not apply in this case because this action did not fall within the narrow exception of federal jurisdiction, but rather is squarely within the province of the federal courts because the complaint raises important issues of religious discrimination. *See Fourth Quarter Props. IV, Inc. v. City of Concord, N.C.*, 127 Fed.Appx. 648, 654 (4th Cir.2005) ("abstention from the exercise of federal jurisdiction is the exception, not the rule"); *Skipper v. Hambleton Meadows Architectural Review Comm.*, 996 F.Supp. 478, 481 (D.Md.1998) (holding that grounds for abstention are "extraordinary and narrow" and only apply in "exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest"). Moreover, RHI's "federal claims [of religious discrimination under RLUIPA and the Equal Protection Clause] ... do not rest on finding a violation of state law, are federal not only in 'clothing,' but also in fact. Such claims are 'plainly federal in origin and nature,' are independent of any state law violation, and do not threaten uniform state regulation." *Martin*, 499 F.3d at 368 (internal citations omitted) (holding that plaintiff's federal Due Process and Equal Protection challenges to state statute regulating video gambling machines did not threaten state interest in uniformity and did not implicate difficult questions of state law nor did state interests outweigh federal interest in adjudicating federal claims). Because RHI's claims alleging religious discrimination under RLUIPA and the Equal Protection Clause

18. *Burford v. Sun Oil Co.*, 319 U.S. 315, 331– 32, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

do not involve difficult questions of state law nor do they threaten a state interest in uniform regulation, the Burford abstention doctrine does not justify abstention here.

 Neither *Pullman*[19] nor *Younger*[20] abstention applies to the current case because the state proceedings are no longer pending. *Pullman* abstention is also inapplicable because the present case does not turn on an undecided issue of state law; to the contrary, the issues before this Court are uniquely federal—interpretation of federal Constitutional and statutory rights.

 The *Rooker–Feldman*[21] doctrine does not apply to this case because

19. The *Pullman* doctrine applies when there is a question of unsettled state law and a state court's clarification of state law might make a federal court's constitutional ruling unnecessary. *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Two factors must be present for *Pullman* abstention to be warranted: (1) there must be substantial uncertainty as to the meaning of the state law, and (2) there must be a reasonable possibility that a state court's clarification of state law might obviate the need for a federal constitutional ruling. *Kusper v. Pontikes*, 414 U.S. 51, 54–55, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).

20. The *Younger* doctrine is somewhat different than the *Pullman* doctrine. While originally developed in the context of criminal proceedings, *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), it has been applied to civil cases where the state government was a party or where an important state interest is involved. *See Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). However, *Younger* abstention only applies when there is a pending state proceeding. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). Further, *Younger* abstention is not appropriate if the litigant will not be afforded an adequate opportunity to litigate constitutional claims in the state proceedings. *Id.*

21. The *Rooker–Feldman* doctrine has been applied only three times by the Supreme Court; twice in the cases for which the doctrine is named (*Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)), and most recently in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). The basic notion behind this doctrine is that federal district courts do not have appellate jurisdiction to review the decisions of the state courts because that appellate jurisdiction is vested exclusively in the United States Supreme Court. Under this doctrine, a federal district court lacks subject matter jurisdiction over a case challenging the judgment of a state court. *Exxon Mobil Corp.*, 544 U.S. at 291, 125 S.Ct. 1517; *Adkins v. Rumsfeld*, 464 F.3d 456, 463 (4th Cir. 2006). In *Exxon Mobil*, the Supreme Court narrowed the scope of the doctrine; specifically, the Court noted that *Rooker–Feldman* did not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court. If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party ... then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id.* at 293, 125 S.Ct. 1517. Notably, the Supreme Court was not concerned with the possible implication that the narrowing of this doctrine might encourage litigants to file federal actions as "insurance policies" in the event of a loss in the state court system. *Id.* at 294 n. 9, 125 S.Ct. 1517. After reviewing the facts, the Supreme Court concluded that the district court had jurisdiction over the *Exxon Mobil* case because the case had been filed before there was a final disposition in the state court system, and because the plaintiff in federal court was not seeking to have the state court decision reversed. Applying the holding of *Exxon Mobil*, the Fourth Circuit further clarified the infamous "inextricably intertwined" language that stems from a footnote in the *Feldman* case was not intended to be read broadly as "creat[ing] an additional legal test for determining when claims challenging a state-court decision are barred." *Davani v. Va. Dep't of Trans.*, 434 F.3d 712, 716–719 (4th Cir.2006). Thus,

RHI is not seeking to review state court judgments that upheld the denials of its 2003 water and sewer category change application and its subdivision application; rather, RHI alleges that Defendant has engaged in a pattern of discriminatory conduct such that those denials are merely one component of the pattern of challenged conduct (the other being the denial of its 2005 water and sewer category change application and the passage of CB–83–2003).

 Finally, neither res judicata[22] nor collateral estoppel[23] applies to bar RHI's claims before this Court. The development plan that RHI presented at trial—and upon which RHI seeks the Court's exercise of its equitable injunctive powers—was different than *any* and *every* prior plan that had been submitted as part of an application before Defendant. *See* (Pl.'s Trial Ex. 2). Simply put, res judicata and collateral estoppel cannot apply to bar RHI's relief on a new application because the claims and/or issues resolved in the prior state cases are not "identical" to the application that it seeks to file; the size of the church's footprint, the parking, the percentage of lot coverage, the required extension of the sewer line and the water hook-up are all different from the specifications of RHI's developments submitted in conjunction with prior applications. *See* (Pl.'s Trial Ex. 2; 9/8/08 Hr'g Tr. 46, 50, 51). The 2003 water and sewer

category change application sought an upgrade for the back 3.6 acres of the front parcel *plus* the entire 10.04 acres of the rear parcel, the subdivision application sought to combine both parcels into one, and the 2005 water and sewer category change application sought an upgrade of the category 5 land on the front *and* rear parcels; to the contrary, the proposed plan presented at trial seeks *only* a water and sewer category change of the front portion of the front parcel. *See* (Pl.'s Trial Ex. 2, 6, 22; 4/15/08 Tr. 104–05, 117–19, 121).

Indeed, upon questioning by the Court at the hearing on the post-trial motions, RHI acknowledged that this plan would permit it to build a church and surrounding structures such that it could freely exercise its religion and it was designed to be even farther from the Rocky Gorge Reservoir to minimize any possible environmental impact and comply with the state laws in existence if the Court enjoined the application of CB–83–2003 as the lot coverage on the Property would be 43% while the remaining applicable laws restricted lot coverage to 50% maximum lot coverage. 9/8/08 Hr'g Tr. 48–51. RHI explained that it would need to seek a water and sewer category change for the remainder of the front parcel of land, which would be a new and different category change application than the ones it had submitted (and which had been de-

---

where a plaintiff's "suit does not challenge the state court's decision, and it instead seeks redress for an injury allegedly caused by [defendant], the *Rooker–Feldman* doctrine does not apply...." *Id.*

**22.** Claim preclusion, or res judicata, exists when: (1) the parties in the present litigation are the same or in privity with the parties of the earlier dispute, (2) the claim in the present action is identical to the one determined in the prior adjudication, and (3) there has been a final judgment on the merits. *Colandrea v. Wilde Lake,* 361 Md. 371, 761 A.2d

899, 910 (2000). Claim preclusion applies "not only as to all matters decided in the original suit, but also as to matters that could have been litigated in the original suit." *Id.*

**23.** Under Maryland law, issue preclusion applies when: (1) the issue decided in the prior adjudication is identical to the issue in the present action, (2) there was a prior final judgment on the merits, and (3) the party against whom the decision is being used was a party in the prior action. *O'Reilly v. County Bd. of Appeals for Montgomery County, Md.,* 900 F.2d 789, 791 (4th Cir.1990).

nied) in the past. (9/8/08 Hr'g Tr. 46, 48–51).

Finally, Defendant erroneously characterizes the nature of RHI's claims. The RHI attack is not on one administrative or legislative action in isolation, but rather the effect of a pattern or series of actions the discriminatory animus for which has now been established by the jury's special verdicts.

In conclusion, there is no bar to the Court's application of its broad equitable powers in issuing an injunction as to the application of CB–83–2003 to RHI and ordering Defendant to review and process RHI's water and sewer category change application in compliance with all applicable laws without discriminatory animus or interference.

### b) RHI's Entitlement to Injunctive Relief

Defendant contends that RHI is not entitled to injunctive relief because RHI has not suffered irreparable harm, monetary damages are sufficient, the balance of hardships tips in favor of Defendant, and the public interest would not be served by the granting of an injunction. RHI is entitled to injunctive relief under both the Equal Protection Clause and RLUIPA, and it will be granted.

■ The Court may issue a permanent injunction if four conditions are met: 1) plaintiff will suffer an irreparable injury; 2) monetary damages are insufficient to compensate for that injury; 3) the balance of hardships warrants equitable relief; and 4) the public interest is not disserved by a permanent injunction. *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir.2007) (citation omitted).

■ RHI has suffered and will continue to suffer irreparable harm in the absence of a permanent injunction. Intentional discrimination under the Equal Protection Clause and the infringement of one's rights under RLUIPA constitute irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (holding that loss of First Amendment rights is irreparable injury); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir.1984) (holding that presumption of irreparable injury from fact of intentional discrimination applies). As noted earlier, RHI purchased its property over six years ago, yet has been restricted from building its primary house of worship on that property since then. RHI has incurred significant monetary expense in attempting to obtain approval and surmount the repeated obstacles posed by Defendant during that time. RHI's religious exercise has been impaired by its current lease arrangement at Cedar Ridge, which, for only nine hours a week, is insufficient to meet RHI's religious mission of teaching, worship, and other activities. Finally, RHI has been harmed by the uncertainty of its current lease at Cedar Ridge because its landlord may terminate it at any time as well as the uncertainty regarding its property which has sat empty for the past six years and for which a substantial balloon mortgage payment is due, which RHI may be unable to meet.

■ Monetary damages alone are insufficient to compensate RHI because, while they may address the issue of default on the balloon mortgage payment and the cost of years of delayed land use applications, they do not compensate RHI for the infringement of the ability of its congregation to have a primary place of worship and other violations of its free exercise rights given the inadequacy of its current lease at Cedar Ridge.

■ The balance of hardships tips heavily in favor of RHI. While RHI has had its fundamental right to free exercise of religion burdened by Defendant's actions over the past six years and has suf-

fered various financial harms, there is no evidence in the record that Defendant will suffer any hardship. Specifically, there is no evidence in the record that an injunction against CB–83–2003 or the approval of RHI's new water and sewer category change application or a subdivision application will lead to any damage to the environment or the community; as noted previously, Defendant did not adduce any evidence at trial as to any impact that RHI's plans would have on the Rocky Gorge Reservoir or the community (which already has a church and a similar large-scale residential development Dugan's Estates) nor did Defendant address why certain mitigation measures (such as water purification of impervious surface runoff) could not and would not suffice. Defendant's conclusory assertion that RHI's church would be out of character with the surrounding neighborhood is belied by the permitted status of churches in the R–A zone, the existence of another church a short distance away, and other non-residential uses such as schools in the neighborhood.

 Finally, an injunction would be in the public interest of furthering the exercise and protection of the constitutional right to the free exercise of religion. "By passing RLUIPA, Congress conclusively determined the national public policy that religious land uses are to be guarded from interference by local governments to the maximum extent permitted by the Constitution." *Cottonwood Christian Ctr.*, 218 F.Supp.2d at 1230 (granting a preliminary injunction).

### CONCLUSION

A house is not a home. The physical structure at Cedar Ridge may be a house for RHI but it is not and cannot serve as its religious home. Cedar Ridge has been, is, and will continue to be insufficient for RHI to exercise its rights under the Constitution and RLUIPA. Defendant's actions have forced RHI's members to limit core activities that they, as Seventh Day Adventists, sincerely believe in and are entitled to practice. Thanks to the actions of the Defendant, RHI's exercise of religion in this case didn't have a prayer, and this Court will now step in and attempt to right the wrong.

For the reasons stated above, RHI is entitled to relief under the Equal Protection Clause and RLUIPA, and the Court will (1) declare that CB–83–2003 is unconstitutional and in violation of RLUIPA as applied to RHI; (2) enjoin the application of CB–83–2003 as to the property of RHI; and (3) order that Defendant process any water and sewer category change application that RHI may hereafter file without regard to the provisions of CB–83–2003 and without any discriminatory animus.

Six years after the purchase of the Property, it is now time that RHI be able to construct its worship facilities with the words of poet Thomas Hood [24] whispering in the background:

> Peace and rest at length have come,
> All the day's long toil is past;
> And each heart is whispering, "Home,
> Home at last!"

### ORDER AWARDING DAMAGES, DECLARATORY RELIEF, AND INJUNCTION

Upon consideration of Defendant's Renewed Motion for Judgment as Matter of Law [Paper No. 99], Plaintiff's Opposition thereto, Defendant's Reply, the oral arguments by counsel, the record, and for the reasons stated in the accompanying Memorandum Opinion, it is this 4th day of November, 2008, by the United States Dis-

---

**24.** Thomas Hood, *Home At Last*, 6095 (John Bartlett ed., Little, Brown & Co. 1919) (1858).

trict Court for the District of Maryland, hereby

**ORDERED** that Defendant's Renewed Motion for Judgment as Matter of Law [Paper No. 99] is **DENIED;** and it is further

**ORDERED** that judgment on the jury's verdict in the amount of $3,714,822.36 is entered in favor of the Plaintiff against Defendant, Prince George's County, Maryland, with interest from April 24, 2008 and the costs of this action; and it is further

**ORDERED** that the Court finds and declares that CB–83–2003 is unconstitutional and in violation of the Religious Land Use and Institutionalized Persons Act as applied to the Plaintiff; and it is further

**ORDERED** that the Defendants are enjoined from applying the provisions of CB–83–2003 to the property of the Plaintiff; and it is further

**ORDERED** that Defendants are directed to process any water and sewer category change application hereinafter filed by the Plaintiff without reference to the provisions of CB–83–2003 and without delay or religious discrimination; and it is further

**ORDERED** that the Clerk is directed to close this case.