967 A.2d 232

## BETHEL WORLD OUTREACH CHURCH

v.

## MONTGOMERY COUNTY, Maryland, et al.

### No. 3082, Sept. Term, 2007.

Court of Special Appeals of Maryland.

March 9, 2009.

Nathan J. Greenbaum (Barbara A. Sears, Linowes & Blocher, LLP, on brief), Bethesda, for Appellant.

Clifford L. Royalty (Edward B. Lattner, Marc P. Hansen, Leon Rodriquez, County Atty., on brief), Rockville, for Appellee.

Panel: JAMES R. EYLER, ZARNOCH, J. FREDERICK SHARER (Ret., specially assigned), JJ.

JAMES R. EYLER, Judge.

This case concerns the Montgomery County Council's ("Council") denial of a request submitted by Bethel World Outreach Church ("Bethel"), appellant/cross-appellee, to change the water and sewer category designation of its property in Montgomery County for the purpose of constructing a church and ancillary facilities. There is no statutory right of appeal from the Council's action. Thus, Bethel filed a Petition for Administrative Mandamus pursuant to Title 7, Chapter 400 of the Maryland Rules against the Council and Montgomery County, appellees/cross-appellants (collectively, "the County"), contesting the legality of the Council's action. The petition was dismissed without prejudice by the Circuit Court for Montgomery County based on its determination that the Council acted in a legislative, rather than a quasi-judicial, capacity.

Bethel subsequently amended the petition, which in its final form contained seven counts: I. Certiorari; II. Judicial Review; III. Mandamus; IV. Declaratory Judgment; V. Injunctive Relief; VI. Religious Land Use and Institutionalized Persons Act (RLUIPA); and VII. Maryland Declaration of Rights, Article 24.[1] Both parties moved to dismiss or for

---

1. An action seeking a writ of certiorari, under Md. Rule 7–301, a declaratory judgment, or a writ of mandamus pursuant to Title 15, Chapter 700 of the Md. Rules, is ordinarily not used to seek judicial review of a quasi-judicial action. An action for judicial review (administrative mandamus), pursuant to Title 7, Chapter 400 of the Md. Rules, is ordinarily used to initiate judicial review of a quasi-judicial action

summary judgment, and the circuit court entered summary judgment in favor of the County. In doing so, the court reversed its earlier determination and found that the Council acted in an administrative, or quasi-judicial, capacity when it denied Bethel's request, but concluded that the denial was supported by substantial evidence. The court additionally found that the non-administrative mandamus counts lacked merit because they were not properly part of an administrative appeal, and that RLUIPA and Article 24 claims lacked evidentiary support. Bethel appealed, and the County cross-appealed.

At the center of this case is the Private Institutionalized Persons ("PIF")[2] Policy contained in Montgomery County's Ten–Year Comprehensive Water Supply and Sewerage Systems Plan ("water and sewer plan" or "plan"). The former version of this policy, applicable at the time Bethel's request was under consideration, allowed the Council to amend the water and sewer plan to change the category designation of properties owned by PIFs located outside the community water and sewer service envelope, thus allowing the development of such properties.

On appeal, Bethel presents the following questions concerning the denial of its application under the PIF policy, which we have consolidated and rephrased:[3]

---

when such review is not expressly authorized by law. An action for judicial review, pursuant to Title 7, Chapter 200, is the appropriate vehicle to initiate judicial review of a quasi-judicial action when review is expressly authorized.

2. The water and sewer plan defines PIFs as "buildings constructed for an organization which qualifies for federal tax exemption under the provisions of Section 501 of Title 26 of the United States Code (Internal Revenue Service)." Common PIFs include religious institutions, senior housing, private schools, and day care centers.

3. The questions as presented in Bethel's brief are as follows:
   I. Should the circuit court be reversed when it failed to rule that the County Council's denial of Bethel's application was arbitrary, capricious and unlawful where (1) the application satisfied every requirement of the PIF policy; (2) the Council failed to articulate

I. Was the Council's denial of Bethel's application arbitrary, capricious, and unlawful?

II. Did the circuit court err in denying Bethel's RLUIPA claim without making any specific findings or conclusions of law as to the substantial burden component of that claim?

The County raises the following questions on cross-appeal, which we have again consolidated and slightly reworded:

I. Are the claims for (1) judicial review, (2) mandamus, (3) declaratory and injunctive relief, and (4) violations of RLUIPA cognizable?

II. Did the circuit court err by granting the County's motion to dismiss or for summary judgment?

III. Did the circuit court err by denying the County's motion to compel discovery and motion to strike a report prepared by Bethel's expert?

We agree with the circuit court that the Council's action was not arbitrary and capricious and that the evidence was insufficient to support the RLUIPA claim. Consequently, we shall affirm the entry of summary judgment.[4]

---

any reason for the denial; and (3) the County has attempted-after its final decision-to justify the Council's denial by applying criteria beyond the language of the PIF Policy?

II. Should the circuit court be reversed when it failed to rule that the Council's denial of Bethel's application was arbitrary, capricious and unlawful where the Council had previously approved water and sewer category change requests for similarly situated PIF applicants located in the same RDT Zone under the PIF Policy?

III. Did the circuit court err in denying Bethel's RLUIPA claim without making any findings or conclusions of law as to whether the Council applied a land use regulation [the PIF policy] in a manner that imposes a substantial burden on Bethel's religious exercise?

We note that I(1)-(3) and II are actually arguments in support of the contention that the Council's action was arbitrary and capricious, and we shall treat them as such.

4. The circuit court conducted a judicial review of the Council's action on the premise that the Council acted as an administrative body and concluded that the Council's action was not arbitrary and capricious.

## Facts and Proceedings

Maryland Code (2007 Repl.Vol., 2008 Supp.), § 9–503 of the Environment Article ("EA") requires Maryland counties to develop 10–year plans addressing, among other things, water supply systems and sewerage systems. The statute requires that county plans "[p]rovide for the orderly expansion and extension of [water supply and sewerage systems] in a manner consistent with all county and local comprehensive plans . . . ." EA § 9–505(a)(1); *see also* Code of Maryland Regulations ("COMAR") 26.03.01.02. Accordingly, each plan must establish category designations indicating the status of community water and sewer service in each area of the county. COMAR 26.03.01.04. The Maryland Department of the Environment ("MDE") must approve each plan and any subsequent revisions or amendments adopted by the county's governing body. EA §§ 9–503(a), (c). Additionally, counties must hold a public hearing before revising, amending, or adopting a new plan. *Id.* § 9–503(d).[5]

---

The court entered summary judgment in favor of the County based on the contents of the record from the Council proceedings. Even though we conclude the Council's action was legislative, we can nonetheless affirm the judgment because we do so for the same reason given by the circuit court, *i.e.*, the Council's action was not arbitrary and capricious. In determining whether an action was arbitrary and capricious, to the extent there is a difference in the standard, a less rigorous standard applies in reviewing legislative action pursuant to a court's original jurisdiction than that which applies in an administrative appeal. *Fogle v. H & G Restaurant*, 337 Md. 441, 453–55, 654 A.2d 449 (1995). The case was pled in circuit court as both an action invoking the original jurisdiction of the court to review a legislative action and as an administrative appeal.

The circuit court concluded that there was no evidence to support the RLUIPA claim. We agree. The procedural history of this case is somewhat unusual, and the court and parties were uncertain as to whether it was an administrative appeal, but we note that Bethel at no time requested additional discovery. Thus, we decide this case on the record as it exists.

5. EA § 9–515 contains requirements specific to Montgomery and Prince George's Counties, many of which overlap with the general requirements of § 9–503.

In the case before us, the County's water and sewer plan consists of text containing general objectives and policies, and specific requirements applicable to water and sewer systems; appendices containing technical information and updates to the plan; and maps identifying the water and sewer categories for all properties located within the County. The property at issue, an undeveloped 119.37 acre parcel located at 10715 Brink Road, is designated W–6 (water) and S–6 (sewer) by the County's water and sewer plan, which are labels for "[a]reas where there is no planned community service either [within ten years or beyond]."

The property is located within the County's Rural Density Transfer ("RDT") Zone, which is primarily intended for agricultural use. The water and sewer plan specifies that RDT zones "are generally not intended to be served by community systems. However case-by-case exceptions can be considered where community service is logical, economical, environmentally acceptable, and does not risk extending service to non-eligible properties." The County's Functional Master Plan for the Preservation of Agricultural and Rural Open Space ("master plan") likewise recommends the denial of "water and sewer service to areas designated for agricultural preservation that utilize the RDT Zone."

One mechanism for obtaining an exception to the general prohibition on community water and sewer service in the RDT Zone was the water and sewer plan's PIF policy, as it existed prior to late 2005. The pre–2005 PIF policy allowed the County Council to consider requests for category change amendments from PIFs located outside the water and/or sewer envelope. Under the pre–2005 PIF policy, approval for new PIF uses requiring new water and/or sewer main extensions, such as the property at issue, was permitted only when the required main extensions would "abut only properties which are otherwise eligible for service under the general policies of [the water and sewer plan]."

In April 2001, the owner of the property at issue, Farm Development Company, LLC ("Farm Development"), request-

ed that the county change the property's water and sewer service area categories to W–3 and S–3, thus giving it "immediate priority" for construction of community water and sewer service. This change was necessary to accommodate Farm Development's plan to subdivide the property and construct four 1,000–seat church facilities.[6]

During the same period when the Council was first considering Farm Development's category change request, the PIF policy was coming under scrutiny due to the increasing and unexpected number of PIFs populating the County's rural areas. A memorandum from the Council's legislative analyst to the Council, dated February 22, 2002, listed 13 category change requests, including Farm Development's, up for consideration as part of the Council's semi-annual review of proposed amendments to the water and sewer plan. Farm Development's request was one of five requests singled out for more in-depth discussion based on the "issues" it raised. An Executive Staff Report on the Farm Development proposal contained in the memorandum commented that it "would provide for a large institutional use in the RDT-zone that would have the potential for greater environmental impacts than any allowed for non-institutional uses." The report also stated that "the extension of public water would abut one additional property zoned RDT [and][t]he extension of sewer could abut additional properties depending on its final alignment." Consequently, the report advised the Council that it "would have to amend the water (and possibly sewer) main as a restricted access main" and noted that the Council had "not used this approach for specific category changes in the past." Because of these and other issues, the County Executive and the Maryland National Capital Park and Planning Commission ("M–NCPPC")[7] recommended that the Council defer Farm

---

6. The size and nature of the intended use, and characteristics of the land made septic disposal systems impractical.

7. The M–NCPPC is a state entity comprised of ten commissioners—five each from Montgomery County and Prince George's County—with certain planning and zoning functions in those counties. *See generally*

Development's request pending its upcoming review of the PIF policy. The County's Transportation and Environment Committee ("T & E Committee") concurred with this evaluation.

Indeed, the issues raised by Farm Development's request were among those singled out during the PIF policy review, which occurred in 2003 as part of the County's mandatory triennial review of its water and sewer plan. *See* EA §§ 9–503, 9–515. In July 2003, the County Executive submitted to the Council a draft comprehensive update to the water and sewer plan that identified a number of "unintended concerns" created by the PIF policy, including the following:

> The policy has resulted in the clustering of PIF uses at the edge and outside of the acknowledged community water and/or sewer service envelopes.

> The policy has facilitated the siting of PIF uses on properties where the institutional use and its ancillary needs, especially parking, can create imperviousness far in excess of that normally resulting from residential uses, leaving little open space and creating water quality problems.

> The policy has facilitated the siting of PIF uses within the county's RDT-zoned agricultural preserve areas.

The draft plan also included several substantive modifications to the PIF policy, including a complete prohibition on PIF approvals in the RDT zone. Nevertheless, it acknowledged that:

> The County cannot address [ ] all of the issues affecting private institutional uses only within the context of the Water and Sewer Plan. Addressing these issues will involve considering changes to other aspects of the County's land

---

Maryland Code (1957, 2003 Repl.Vol., 2008 Supp.), Article 28 (Art. 28). The five members of the commission from each County serve as a separate Planning Board that addresses planning and zoning matters affecting only their respective jurisdictions. Art. 28, § 7–111(a). EA § 9–516 also details the advisory role of the M–NCPPC in the development of Montgomery and Prince George's Counties' water and sewer plans.

use planning, zoning and water quality protection processes. The County will likely need to address these institutional uses in the context of its master plans, zoning and subdivision ordinances, and water quality regulations.

The M–NCPPC raised similar concerns about the PIF policy. An October 1, 2003, a memorandum from M–NCPPC staff to the Planning Board listed the following problems associated with the unanticipated proliferation of PIFs in areas zoned for single family residential and agricultural use:

Traffic congestion/parking overflow during times of peak facility uses.

Cumulative size and intensity of select PIF uses in residential areas that are out of scale with the surrounding single-family residential uses.

Significantly increased impervious area for PIF, when compared with development for underlying base zoning.

To address these problems, M–NCPPC staff recommended suspending all PIF requests "until a revised policy is adopted which addresses community and environmental impacts." Suggested policy revisions included capping the amount of impervious surface for PIF uses and adopting "planning, zoning and water quality protection measures."

A November 14, 2003, memorandum from the Council's legislative analyst to the Council summarized the positions of the County Executive and M–NCPPC regarding the PIF policy, and noted the recommendations of the T & E Committee. The memorandum advised that the impervious surface cap and other proposed restrictions on the PIF policy would not solve all land use problems associated with PIFs, as some PIFs could still build with well and septic systems. Accordingly, the T & E Committee urged the Council to continue reviewing PIF requests on a case-by-case basis, and address the proposed prohibition on PIF approvals within the RDT zone, and the cap on impervious surface through zoning or subdivision regulations.

On November 18, 2003, the Council approved the updated water and sewer plan. The updated plan placed some new

restrictions on PIF's,[8] but deleted the draft language prohibiting PIF's in the RDT zone, and did not cap impervious surface. The text of the plan, however, described the modifications as "an interim step towards a final policy" and recommended further action to address concerns raised by PIF's.

In March 2004, Bethel, pursuant to a purchase contract for the property,[9] submitted a letter to the Montgomery County Department of Environmental Protection ("DEP") amending the Farm Development request to identify itself as the new applicant. The letter also revised the tentative development proposal, describing a new site plan as follows:

Religious sanctuary seating up to 3000 persons. Currently there are 3000 members.

Religious school and daycare building. (250 children)

Social hall with a capacity of 600–800 persons and serving a dual function to accommodate youth and fellowship activities.

Administrative offices. Present offices are occupied by 28 full time and part time employees.

By memorandum dated October 11, 2004, the County Executive recommended that the Council approve Bethel's category change request conditioned on DEP's confirmation that the sewer main extension would comply with the PIF policy.

In late 2004, as the Council was again preparing to vote on Bethel's category change request, the Planning Board and Council staff recommended further deferral of the request pending the Council's consideration of a zoning text amendment ("ZTA"). The ZTA, originally submitted to the Council by the Planning Board in April 2004, proposed limiting impervious surface in the RDT zone to 15% of the lot area. The

---

**8.** These restrictions included a requirement that the PIF applicant be the actual private institution seeking water and community service, and a prohibition on Washington Suburban Sanitary Commission ("WSSC") capital projects supporting only PIF uses.

**9.** Bethel closed on the purchase contract in June 2004, paying in excess of $3 million.

Council deferred Bethel's category change request, but did not take immediate action on the ZTA.

In January 2005, the Council formed an interagency working group to study the environmental impact of PIFs in rural zones. Following several meetings and a public forum, the working group issued a report dated June 27, 2005, detailing its recommendations. These recommendations included adopting the previously rejected prohibition on PIFs in the RDT zone, and approval of the ZTA, capping impervious surface on lots in the RDT zone at 15% of total lot area.

The T & E committee held a public hearing on September 29, 2005, to solicit community input on a package of category change requests, including Bethel's. A second public hearing was conducted by the full Council on November 8, 2005, to receive comments on the proposed ZTA and the prohibition on community service to PIFs in the RDT zone.

The Council was advised by memorandum dated November 23, 2005, that the T & E Committee recommended approval of Bethel's request, conditioned on a conservation easement approximately 10 acres in size, and a 25% limit on impervious surface. The Planning Board, however, recommended denying the request. Further, the Council was cautioned that MDE might deny future amendments to the water and sewer plan under the PIF policy if they conflicted with the recommendations of the master plan.

On November 29, 2005, the Council met to consider the package of water and sewer category change requests, including Bethel's, and the amendment to the plan prohibiting PIFs in the RDT zone.[10] Though Bethel agreed to the conditions proposed by the T & E Committee, the Council voted 6–2 to deny its request. The Council also approved the amendment prohibiting community service to PIFs in the RDT zone.

**10.** The 2005 policy creates an exception for cases where community water and sewer service is needed to "relieve health problems caused by the failure of on-site systems."

At this point, we fast forward to observe that, on appeal, Bethel takes the position that its request was denied by the Council under the pre–2005 PIF policy, which gave the Council discretion to grant a category change, and not under the newly adopted 2005 PIF policy, which precluded approval of Bethel's request. The County takes the position that the Council denied Bethel's request under the 2005 policy.

Based on our review of the entire legislative record, we conclude that the Council denied the request under the pre–2005 policy. As Bethel argues, had the Council applied the 2005 policy, there would have been no reason to debate individual applications. Our review of the transcript of Council proceedings reveals that Council members were aware of the retrospective application issue that might result from the adoption of a new policy, discussed whether the 2005 policy, if adopted, should contain a grandfathering clause, and informally decided that it should. As adopted, the 2005 policy is silent in that regard, but that is consistent with our conclusion that ultimately the Council decided the pending, individual applications under the pre–2005 policy; therefore, there was no need to grandfather pending applications.[11]

On January 27, 2006, Bethel filed a Petition for Administrative Mandamus in the Circuit Court for Montgomery County. Bethel's petition was filed pursuant to then new Title 7, Chapter 400 of the Maryland Rules, which, as of January 1, 2006, "govern[s] actions for judicial review of a quasi-judicial order or action of an administrative agency where review is not expressly authorized by law." Md. Rule 7–401. The County moved to dismiss on March 26, 2006, arguing that Bethel's petition was untimely, and that the new administrative mandamus rules were inapplicable because the Council

---

11. Consequently, we do not reach Bethel's argument that EA § 9–515(g) prevented the Council from applying the 2005 policy. *See* EA § 9–515(g) (specifying that an amendment or revision to the plan adopted by the Council "is not final until 10 days after the action adopting it," and giving the County Executive authority to review the changes and make recommendations to the Council during that time period).

acted in a legislative rather than a quasi-judicial capacity. The circuit court agreed with the latter argument, and by orders dated July 10, 2006 and August 11, 2006, granted the County's motion, dismissing both petitions for administrative mandamus [12] without prejudice to Bethel's right to file an amended petition within 30 days.

Bethel filed an amended petition on August 9, 2006, which developed into a third amended petition containing counts for certiorari; judicial review/administrative mandamus pursuant to Title 7, Chapter 400 of the Md. Rules; mandamus pursuant to Title 15, Chapter 700 of the Md. Rules; declaratory judgment; injunctive relief; a violation of RLUIPA; and a violation of Maryland Declaration of Rights, Article 24. Both parties designated expert witnesses and engaged in discovery. On November 29, 2007, the County filed a motion to dismiss or for summary judgment. Bethel responded on December 4, 2007, with its own motion for summary judgment, supported by an expert's report. The County moved to strike the report on grounds that Bethel's challenge was confined to the record relating to the Council's action, and that the report contained opinions beyond the scope of the author's expertise.

On December 28, 2007, the trial court conducted a hearing on the opposing motions for summary judgment, the County's motion to strike the expert's report, and a motion by the County to compel proper responses to discovery requests.[13] Following an extensive exchange between the parties and the court on the question of whether the Council acted in a legislative or quasi-judicial capacity in denying Bethel's request, the court found that the Council's action was quasi-judicial. Consequently, the court concluded that the certiorari, declaratory judgment, non-administrative mandamus, and injunctive relief counts were not cognizable as part of an

---

**12.** Bethel filed a second petition for administrative mandamus on April 10, 2006, which on July 7, 2006, was consolidated with the first.

**13.** The inconsistency of the County's motions to strike and to compel further discovery is consistent with the uncertainty as to whether this was an administrative appeal.

administrative appeal, and it denied the County's motion relating to the expert's report and discovery responses as moot because the parties were limited to the administrative record. As to the count for administrative mandamus/judicial review, the court found the Council's decision was rational and supported by substantial evidence because Bethel's application did not comply with the pre–2005 PIF policy. Specifically, the court noted that the water and sewer mains necessary to serve Bethel's property would abut properties ineligible for service. In addition, the court, noting that the counts invoking RLUIPA and Article 24 of the Maryland Declaration of Rights did not "rest upon an administrative record," concluded that they were unsupported by the evidence.[14]

## Discussion

### I

Bethel has taken a buckshot approach to challenging the Council's action, presumably because of the uncertainty as to the nature of the Council's action. Bethel's pursuit of this strategy results in a major inconsistency: Bethel treats the case as a judicial review of a quasi-judicial decision by an administrative body, yet it relies on an expert's report that was not part of the administrative record, and asserts a RLUIPA claim that was never raised before the administrative body. *See Halici v. City of Gaithersburg,* 180 Md.App. 238, 248–49, 949 A.2d 85 (2008) ("Ordinarily, a court reviewing the decision of an administrative agency may not pass upon issues presented to it for the first time on judicial review. . . . The failure to raise an issue before the administrative agency is a failure to exhaust administrative remedies and an improper request for the courts to resolve matters *ab initio* that have been committed to the jurisdiction and expertise of the agency. (internal quotation marks omitted) (citations omitted)).

The County contends that we should treat Bethel's complaint, which contained counts for certiorari, non-administra-

---

14. Our summary of the circuit court's findings encompasses both its oral ruling and a written order entered February 4, 2008.

tive mandamus, declaratory judgment, and injunctive relief as a request for review of a legislative act and, accordingly, apply a less rigorous standard of review. The County argues that the Council did not engage in a quasi-judicial process, and Bethel did not claim before the Council that such a process was required.[15]

## A

In order to prune this procedural thicket and properly address the parties' contentions, we must first determine the character of the Council's action. In general terms, a government body acts in a quasi-judicial capacity when it considers "facts about the parties and their activities, businesses and properties. They usually answer the questions of who did what, where, when, how, why, with what motive or intent." *Armstrong v. Mayor and City Council of Baltimore,* 169 Md.App. 655, 668, 906 A.2d 415 (2006) (quoting *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 712, 376 A.2d 483 (1977)) (internal quotation marks omitted). In contrast, legislative action is predicated on facts that "do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion. The difference essentially depends on whether the decision is to be made on individual or general grounds." *Id.* (citations and internal quotation marks omitted).

The County relies heavily on *Appleton Regional Community Alliance v. Cecil County,* 404 Md. 92, 945 A.2d 648 (2008), and *Gregory v. Board of County Commissioners of Frederick County,* 89 Md.App. 635, 599 A.2d 469 (1991), to argue that water and sewer plan amendments are comprehensive planning actions and, therefore, legislative in nature. In its reply brief, Bethel asserts that *Appleton* and *Gregory* were limited to the question of whether a water and sewer plan amendment was a "zoning action" within the meaning of Maryland Code

---

**15.** The County additionally argues that Bethel's counts for certiorari, non-administrative mandamus, declaratory judgment, and injunctive relief are not cognizable because the State is a necessary party.

(1957, 2007 Repl.Vol.), § 4.08(a) of Article 66B (Art. 66B), and did not decide whether the process was quasi-judicial or legislative. Bethel alternatively points to *Maryland Overpak Corp. v. Mayor and City Council of Baltimore*, 395 Md. 16, 909 A.2d 235 (2006), as supporting its argument that the Council acted in a quasi-judicial capacity when considering the category change request.

■ We agree with Bethel that *Appleton* and *Gregory* are not definitive on the question of whether the denial of Bethel's request for a category change amendment to the water and sewer plan was a legislative act. Many of the cases relied on by the parties address the meaning of "zoning action" as used in Art. 66B, which provides an express right of appeal from zoning actions. In answering that question, the early cases did not clearly focus on whether the action was quasi-judicial or legislative in nature, but the later cases have done so. *Compare Bd. of County Comm'rs of Carroll County v. Stephans*, 286 Md. 384, 388–397, 408 A.2d 1017 (1979), *with Md. Overpak*, 395 Md. at 32–40, 909 A.2d 235. As was pointed out in *Md. Overpak*, the determination of whether an action is legislative or quasi-judicial does not necessarily determine whether it constitutes "zoning action." 395 Md. at 36–37, 909 A.2d 235. Nonetheless, the later cases addressing "zoning action" are instructive because they discuss the difference between quasi-judicial and legislative action as a necessary part of the determination of "zoning action." *Id.* at 53, 909 A.2d 235. Our review of the cases convinces us that the Council's action was legislative.

In *Appleton*, a developer asked the Board of County Commissioners of Cecil County to upgrade the water and sewer category designation of a property on which it planned to construct a residential development. 404 Md. at 94–95, 945 A.2d 648. The Board eventually approved the proposed amendment, prompting a group of citizens to file a petition for judicial review challenging the approval. *Id.* at 96–97, 945 A.2d 648. The citizens sought review pursuant to Art. 66B,

§ 4.08(a), which authorizes judicial review of "a zoning action of a local legislative body." *Id.* at 98, 945 A.2d 648.

The circuit court dismissed the petition, and this Court affirmed, holding, *inter alia,* that the plan amendment was not a "zoning action" subject to judicial review under § 4.08(a). *Id.* The sole issue considered by the Court of Appeals was the question of reviewability under § 4.08(a). *Id.* at 98–99, 945 A.2d 648. The Court began its analysis by summarizing the criteria for a judicially reviewable "zoning action":

[F]irst, there must be a determination that the process observed by the governmental body in affecting an alleged zoning action was quasi-judicial in nature, rather than legislative. A quasi-judicial proceeding in the zoning context is found where, at a minimum, there is a fact-finding process that entails the holding of a hearing, the receipt of factual and opinion testimony and/or forms of documentary evidence, and a particularized conclusion, based upon delineated statutory standards, for the unique development proposal for the specific parcel or assemblage of land in question. Second, if the governmental act in question involves a quasi-judicial process, the inquiry moves to the question of whether it qualifies as a "zoning action." Where the [legislative body] exercises its discretion in deciding the permissible uses and other characteristics of a specific parcel or assemblage of land upon a deliberation of the unique circumstances of the affected land and its surrounding environs, a "zoning action" is the result.

*Id.* at 101, 945 A.2d 648 (quoting *Md. Overpak,* 395 Md. at 53, 909 A.2d 235 (second alteration in original)).

The Court went on, however, to "assume[ ], without deciding" that the water and sewer plan amendment was adopted by a quasi-judicial process based on the citizens' assertions that the process "was initiated by a single party, [the developer]; required a hearing with receipt of factual and opinion testimony; and, covered only a few specific, related parcels of land." *Id.* at 100–01, 945 A.2d 648. The Court further assumed "that the proposed Plan amendment affected only

parcels owned or controlled by [the developer]." *Id.* at 101, n. 10, 945 A.2d 648. These assumptions are not helpful here, as their purpose in *Appleton* was merely to set up the analysis of whether the Board's action constituted "zoning."

The more instructive portion of *Appleton* comes from the Court's refusal to distinguish our decision in *Gregory.* *Id.* at 103, 945 A.2d 648. The citizens in *Appleton* argued that, unlike the more comprehensive amendment at issue in *Gregory,* the amendment in their case was "piecemeal" and thus more closely resembled a reviewable "zoning action" than a non-reviewable "planning action." *Id.* at 103–04, 945 A.2d 648. Citing *Gregory,* the Court wrote that "all amendments to a Master Water and Sewer Plan are, by definition, comprehensive planning actions." *Id.* at 104, 945 A.2d 648. "Thus," the Court stated, "merely because amendments to the Plan occur in small steps does not mean that the inherent planning process is transformed into a 'zoning action.' " *Id.* at 104, 945 A.2d 648.

In *Gregory,* like *Appleton,* a group of residents challenged the Board of Commissioners of Frederick County's adoption of an amendment upgrading the water and sewer category of two undeveloped parcels of land. 89 Md.App. at 637, 599 A.2d 469. Also like *Appleton,* the sole issue considered was whether the action was a judicially reviewable "zoning action" under § 4.08(a). *Id.* In answering "no" to this question, we distinguished between comprehensive zoning and planning actions on one hand, and piecemeal zoning actions on the other:

> Planning actions are not substantially concerned with use regulation, and are "contrived to promote the common interest in matters that have from earliest times been considered as embraced within the police power." Comprehensive zoning actions are substantially concerned with use regulation, but share with planning actions a broad or comprehensive land use planning basis.

* * *

Neither a planning action nor a comprehensive zoning action is appealable under § 4.08(a) as a "zoning action." Only a

piecemeal zoning action, which is substantially concerned with regulation of property uses and, in contrast to a comprehensive zoning action, is narrow and restricted in focus, is appealable under § 4.08(a) as a "zoning action."

*Id.* at 640–41, 599 A.2d 469 (citations omitted).

We concluded that the water and sewer plan amendment at issue fell into the former category, and thus was not reviewable under § 4.08(a). *Id.* at 643, 599 A.2d 469. In fact, we were "unable to conceive of a situation in which the adoption of an amendment to a county's comprehensive water and sewerage plan would lack such a comprehensive basis." *Id.*

Thus, while neither *Appleton* nor *Gregory* explicitly labeled a water and sewer plan amendment as a legislative action, both likened the process to comprehensive zoning, which is recognized as legislative in nature. *See Md. Overpak,* 395 Md. at 35–36, 909 A.2d 235 (referring to comprehensive zoning as a legislative action). As Bethel correctly points out, the petitioners in *Appleton* and *Gregory* sought judicial review pursuant to Article 66B, § 4.08(a), while Bethel's petition relies on Title 7, Chapter 400 of the Md. Rules. Nonetheless, this distinction does not lessen the import of the above analogy. Moreover, both cases rejected the comparison of a water and sewer plan amendment to piecemeal zoning by noting that the proposed amendments would have an effect beyond the specific parcels of land seeking a category change, and that a water and sewer plan remains a comprehensive land use planning tool even when it is changed incrementally. *Appleton,* 404 Md. at 103–05, 945 A.2d 648; *Gregory,* 89 Md.App. at 643–44, 599 A.2d 469.

■ The facts of this case reflect these principles, and are consistent with a legislative process. Farm Development/Bethel's category change request was bound up in broader policy considerations nearly from the time it was submitted. When the request first came before the Council, the County Executive and M–NCPPC recommended that it and another PIF request in the RDT Zone be deferred pending a review of the PIF policy. This policy review was prompted by the unex-

pected clustering of PIFs in the RDT zone, which raised environmental concerns and conflicted with the master plan recommendation against extending community water and sewer service to the RDT zone. Though the pre–2005 PIF policy update excluded the proposed prohibition on PIFs in the RDT zone, the Council continued to defer category change requests by Bethel and other PIFs while it considered the ZTA limitation on impervious surface and further revisions to the PIF policy. When the Council was finally prepared to reach a decision on Bethel's request, it conducted public hearings that, based on the portions of the transcripts provided to this court, were largely focused on the broader issues raised by PIFs in rural zoning areas. Moreover, the statements of the Council members at the November 29, 2005, hearing denying Bethel's request indicate their decision was driven by policy considerations:

> [Councilmember Andrews:] I think while this is a tough case because of the timing of the application, it is really the tough cases that make or break a policy, not the easy ones. And I think that the—the interest that has to prevail here is in protecting the Agricultural Reserve for its intended use, and that argues for denying the application for water and sewer.
>
> * * *
>
> [Councilmember Leventhal:] I can't think of a more meritorious use then that use that the church would like to place at the corner of Brink and Wild Cat Roads, but I do know that as long as I serve in the Council there will be other meritorious proposals that are not in keeping with the agricultural and open spaces purposes of the RDT zone.
>
> * * *
>
> [Councilmember Knapp:] So I think we need to, as I have said many times, reaffirm our commitment to Ag Reserve and agricultural policy, while at the same time create an affirmative policy for how we are going to work with our religious institutions and Private Institutional Facilities so

they can grow and expand to meet the challenges that they're confronting as well.

\* \* \*

[Planning Board representative Derick Berlage]: This property is located in the RDT zone. The Planning Board has an almost perfect record of not recommending sewer extensions in the RDT zone. We believe that is a fundamental threat to the Agricultural Reserve not only with respect to the particular property, but once the sewer is in the ground there is no way to guarantee it may not some day be extended further. So our position on this particular application is opposition because it's the RDT zone.

\* \* \*

[Council President Perez]: As I understand our conversations with [sic] relating to water and sewer hookup and the grandfathering, the universe of churches seeking water and sewer hookup in the RDT zone to be grandfathered pursuant to the very tough policy—appropriately tough policy we have just enacted [referring to the prohibition on PIFs in the RDT zone]. I believe the universe is one. Which is—although, well we have rejected the other one that was the Butler property. And so the only one left—maybe I should frame it that way—is Bethel. So, the issue of floodgates is if one church is a floodgate then we have a floodgate problem, but those were the issues that motivated me to vote [in favor of the category change].

There is not a single mention of facts specific to Bethel's property in these statements beyond general references to the plan to build a church. Instead, broad policy considerations predominate, as they did throughout the County's deliberations. Thus, consistent with *Appleton* and *Gregory*, Bethel's request was treated as a comprehensive land use planning issue even though it involved only an incremental change to the plan. Moreover, the Council made this decision of "law, policy, and discretion" by relying on "general facts" character-

istic of a legislative action. *Armstrong*, 169 Md.App. at 668, 906 A.2d 415.

*Maryland Overpak* does not support Bethel's assertion that the Council acted quasi-judicially. The issue in *Maryland Overpak* was whether an amendment to a previously approved planned unit development or "PUD" [16] by Baltimore City amounted to a "zoning action" reviewable under Art. 66B, § 2.09(a) (the analogous section to § 4.08(a) for Baltimore City). 395 Md. at 22–23, 909 A.2d 235. Thus, *Maryland Overpak* involved an amendment to a PUD plan and did not involve a water and sewer plan. Furthermore, the Court itself described the issue before it as "narrow" based on "the somewhat unique character of zoning processes in Baltimore City and the particular facts of the controversy. . . ." *Id.* at 22, 909 A.2d 235.

Although *Maryland Overpak* is not factually analogous to this case, the general distinction made by *Maryland Overpak* between quasi-judicial and legislative action strengthens our position that the Council's action here was legislative. *Maryland Overpak* noted two criteria for a quasi-judicial action: "(1) the act or decision is reached on individual, as opposed to general, grounds, and scrutinizes a single property, and (2) there is a deliberative fact-finding process with testimony and the weighing of evidence." *Md. Overpak*, 395 Md. at 33, 909 A.2d 235 (citing *Armstrong*, 169 Md.App. at 666–71, 906 A.2d 415). The Court added that "it is not a hearing's mere focus on one parcel that is dispositive of its quasi-judicial nature, but rather that the matter taken up at the hearing is disposed of based on the unique characteristics that inhere to that parcel when considering the proposed use." *Id.* at 39, 909 A.2d 235

---

16. A PUD, according to the *Maryland Overpak* Court, is "a relatively modern zoning concept created to provide a degree of flexibility in uses and design not available under strict Euclidian zoning" by "grant[ing] a variety of uses within a development that would otherwise not be permitted under the pre-existing [zoning]." 395 Md. at 22 n. 4, 909 A.2d 235. In Baltimore City, the jurisdiction from which *Maryland Overpak* was appealed, a PUD has more of the characteristics of a special exception that any other zoning mechanism. *Id.* at 30, 909 A.2d 235.

(citing *Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530, 545, 723 A.2d 440 (1999)). As we have already discussed, the Council's action in this case was based on general policy grounds and not on the particular characteristics of the property in question, and therefore fails to meet *Maryland Overpak's* test for a quasi-judicial action.

Before leaving the topic of whether the Council's action was legislative or quasi-judicial, we add the following comments to make clear the scope of our conclusion. All amendments to the Montgomery County water and sewer plan are not legislative in nature. For example, the Council, in section V.F. of the plan, expressly delegated limited authority to DEP to amend both the text and the maps. The plan sets forth the administrative process to be followed and provides for an administrative appeal to the Council. An action by the Council, sitting as an appellate administrative body, is subject to an administrative mandamus action in circuit court because there is no statutory right of appeal.

With respect to PIFs, the plan provides that PIFs located within water and sewer envelopes are subject to the administrative process. It further provides that for PIFs, new or existing, located outside of a water and sewer envelope, the Council considers the request, and such requests are not subject to the administrative delegation process. That, of course, is the situation in the case before us.

A particular action by a legislative body may be legislative or quasi-judicial. We are not holding that all actions by the Council amending the water and sewer plan, even when the nature of the amendment is not subject to the administrative delegation process, are necessarily legislative. We hold that the action, in this instance, was legislative, for the reasons discussed.

## B

Now that we have determined that the Council acted legislatively, both the proper method for obtaining judicial review and the standard of review follow. "A legislative or

quasi-legislative decision ... is [ ] subject to court review, by invoking the court's original jurisdiction." *Armstrong,* 169 Md.App. at 668, 906 A.2d 415. This is accomplished "through the writ of mandamus, by injunction, declaratory action, or by certiorari." *Id.* at 667, 906 A.2d 415. Regardless of which method is selected—and Bethel has invoked all of them—the standard of review is limited "to assessing whether the [the government body] was acting within its legal boundaries." *Dep't of Natural Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 224, 334 A.2d 514 (1975). Bethel relies heavily on *Prince George's County v. Carusillo,* 52 Md.App. 44, 447 A.2d 90 (1982), in support of its argument that the Council's action was arbitrary and capricious, *i.e.,* acted outside its "legal boundaries."

In *Carusillo,* owners of a property zoned for commercial use filed a petition for mandamus challenging the Prince George's County Council's refusal to upgrade their property's water and sewer classification. 52 Md.App. at 45, 447 A.2d 90. On appeal to this Court, we did not address the question of whether the refusal to grant a water and sewer category upgrade request is a judicial or legislative act, rather we held that the Prince George's County Council had no discretion to deny such a request where the applicant met all of the criteria set out in the water and sewer plan. *Id.* at 52, 447 A.2d 90. Bethel argues that the Montgomery County Council likewise lacked discretion to deny its request once it met the criteria specifically set out in the PIF policy.

The *Carusillo* Court did not discuss the contents of Prince George's County's water and sewer plan in great detail, but the plan at issue in this case appears to provide the Council with considerably more discretion. The relevant provision of the PIF policy states that "service area category amendments *may* be approved for sites only where required water and/or sewer main extensions will abut only properties which are otherwise eligible for community service under the general policies of this plan." (Emphasis added). Putting aside, for a moment, the question of whether Bethel's request complied with this requirement, the general policies of the plan for

extending water and sewer service to non-residential zoned areas state:

> Areas zoned for rural development [including the RDT Zone], are generally not intended to be served by community systems. However, case-by-case exceptions can be considered where community service is logical, economical, environmentally acceptable, and does not risk extending service to non-eligible properties. Subsequent policies [including the PIF policy] identify the conditions under which these exceptions can be considered. . . .

The plan also states that water and sewer service decisions should comply with the guidelines established in the master plan. Thus, in addition to the specific criteria in the PIF policy, the Council gave itself discretion to examine environmental considerations, the risk of extending service to ineligible properties, and master plan guidelines when considering category change requests by PIFs in the RDT Zone.[17] There was no indication that the plan in *Carusillo* was similarly structured. Moreover, in *Carusillo*, Prince George's County conceded that the Council was bound to grant an upgrade request when the applicant met the plan's criteria. *Id.* at 52 n. 5, 447 A.2d 90. Here, the County argues that the plan bestows the Council with considerable discretion to grant or deny PIF requests-an assertion that is confirmed by the plan's language.

In addition, without having to rely on the above, Bethel has not demonstrated that the main lines needed to serve its property would comply with the pre–2005 PIF policy. Even the County document recommending approval of Bethel's application, which Bethel points to as evidence of its compliance, does so conditionally based on confirmation "that the

---

17. Bethel's argument that these are *post hoc* reasons offered by the County for denying the request is simply belied by the extensive legislative record. Regardless, in reviewing legislative action we refrain from "institut[ing] an inquiry into the motives of the legislature in the enactment of laws." *County Council for Montgomery County v. District Land Corp.*, 274 Md. 691, 704, 337 A.2d 712 (1975).

needed sewer main extensions can satisfy the PIF policy."
More telling are statements in the record by Bethel's counsel
and County officials that the water and/or sewer main exten-
sions needed to serve Bethel's property would abut one or
more ineligible properties in violation of the PIF policy, thus
necessitating a text amendment [18] to the plan.

We disagree with Bethel's argument that the "Limited
Access" designation offered a mechanism to bring it into
compliance. The pre–2005 PIF policy provided that "[m]ain
extensions outside the acknowledged community service envel-
opes, *where required,* shall be designated 'Limited Access'
consistent with the Limited Access Water and Sewer Mains
Policy." (Emphasis added.) Such mains are "Limited Ac-
cess" because they are "required" and in the case of a new or
relocating PIF request, if in compliance with the pre–2005
PIF policy, would abut only otherwise eligible properties.
The Limited Access Water and Sewer Mains Policy provides
that, in addition to mains which are not limited access for the
above reasons, mains may be specially designated "Limited
Access." The special designation is reserved, however, for
cases where mains "traverse *areas of the County normally
eligible for community service under the general policies of
this plan,* but where such service is limited or restricted by an
action of the Council." (Emphasis added.) There is nothing
in the language of this policy or the PIF policy supporting
Bethel's suggestion that the "Limited Access" designation
permits a new or relocating PIF applicant, located in an area
in which water and sewer service is generally prohibited, to
escape the limitation in the pre–2005 PIF policy that the
mains abut only properties otherwise eligible under the gener-
al policies of the plan.

---

**18.** In the briefs and at oral argument, neither party was able to clearly
articulate what was meant by the reference to "text amendment" in
County documents. We note, however, that while a category change
for a particular property could be noted on the plan maps, approval
of Bethel's application would have violated the text of the plan. Text
amendments of planning and zoning ordinances are typically legislative
in nature.

Bethel further argues that the Council never offered non-compliance with the pre–2005 PIF policy as a reason for denying the amendment. Bethel is somewhat correct in that the question of its compliance was not discussed at the November 29 hearing; however, we are not aware of any requirement that the Council give reasons, while acting in a legislative capacity. All the Council needed was a rational, legal basis for denying the request, which it clearly had.

Finally, to the extent this issue is relevant to the review of a legislative action, we are unconvinced by Bethel's argument that it was treated different from similarly situated applicants. As far as this Court can determine from the record, only one PIF in the RDT Zone was granted a category change after the County began its review of the PIF policy. That request was submitted by Or Chadash Partners, LLC, to allow the construction of a 300–seat synagogue on its 17.2–acre property. In that case, the property was already approved for a single water and sewer connection for residential use. The Executive Staff Report on the Or Chadash request identified the prior approval as a distinguishing feature:

> The Council has deferred action on two category change amendments [pending its PIF policy review] located in RDTzoned sites [including Bethel's]. However, this County has already approved the subject property for restricted public water and sewer service. This action is intended to clarify that prior approval.

All remaining PIF applicants similarly situated to Bethel were, like Bethel, deferred and ultimately denied.

## C

Before addressing Bethel's RLUIPA claim, we must tie up several loose ends. First, because we have determined that the Council acted legislatively, we need not address the County's argument that Bethel's petition for administrative mandamus was untimely, or Bethel's argument that Title 7, Chapter 400 of the Md. Rules applies retroactively. Further, our decision to affirm the circuit court moots the County's conten-

tions regarding the motions to compel discovery and to strike the expert's report. Finally, as to the County's argument that the State is a necessary party, our decision to uphold the Council's action does not implicate the State's authority to approve a water and sewer plan amendment. *See* EA § 9–507(a). Thus, under these circumstances, the State's presence is unnecessary.[19]

## II

■ The Religious Land Use and Institutionalized Persons Act protects religious institutions from local governments that apply land use regulations in a discriminatory fashion or in a manner that imposes a substantial burden on religious exercise. *See* 42 U.S.C. § 2000cc. Bethel contends that the circuit court erred by addressing only the discrimination component of its RLUIPA claim and failing to rule on the substantial burden component. The relevant portion of RLUIPA provides as follows:

*Id.* § 2000cc(a).

(a) Substantial burdens

(1) General rule—No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

(2) Scope of application—This subsection applies in any case in which—

---

**19.** We make no comment on whether the State would be a necessary party in a different scenario.

(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

(b) Discrimination and exclusion

(1) Equal terms—No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

(2) Nondiscrimination—No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

(3) Exclusions and limits—No government shall impose or implement a land use regulation that—

(A) totally excludes religious assemblies from a jurisdiction; or

(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

The circuit court found "no evidence that the County discriminated against Bethel in violation of RLUIPA," but made no explicit finding as to whether the County unlawfully imposed a substantial burden on Bethel. Bethel argues that it also pled a substantial burden claim under § 2000cc(a), and that section applies because the "construction, maintenance and use of [its] proposed facility would implicate interstate commerce" and the Council's denial was based on the imple-

mentation of a land use regulation involving an "individualized assessment[ ] of the proposed use." *See Id.* § 2000cc(a)(2)(B), (C).

The County argues in response that RLUIPA does not apply to a water and sewer plan amendment because it is not a "zoning or landmarking law." *See Id.* § 2000cc (prohibiting discrimination or imposition of substantial burden through the imposition or implementation of a "land use regulation"), § 2000cc–5(5) (defining "land use regulation" as a "zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land....."). The County additionally argues that the circuit court's statement, in context, included the substantial burden claim, and that Bethel never produced any evidence in support of such a claim. We agree with the County's second argument and have no need to address the first argument.

Bethel's primary brief merely states in conclusory fashion that the Council's action imposed a substantial burden without referencing any evidence. Bethel finally gets to the business of attempting to demonstrate a substantial burden in its reply brief. There, Bethel relies on *Reaching Hearts International v. Prince George's County,* 584 F.Supp.2d 766 (D.Md.2008), to argue that the Council imposed a substantial burden by (1) leading it to expend substantial funds and causing delay and uncertainty; (2) creating a reasonable expectation that it would receive a category change and then denying the request, thereby inflicting a hardship on Bethel; and (3) generating the possibility that it will have to sell the land to purchase an alternative property, resulting in unreasonable delay, uncertainty and expense.

We recently addressed the meaning of "substantial burden" in the RLUIPA land used context in *Trinity Assembly of God of Baltimore City, Inc. v. People's Counsel for Baltimore County,* 178 Md.App. 232, 941 A.2d 560, *aff'd,* 407 Md. 53, 962 A.2d 404 (2008). There, we characterized a substantial burden as one that renders religious exercise "effectively impracticable" or compels the religious institution to modify the behavior of congregants in manner that violates their beliefs. *Id.* at

255, 941 A.2d 560. Applying this standard, we held that the denial of a church's zoning variance request to build a larger sign on its property bordering the highway did not impose a substantial burden. *Id.* The Court of Appeals affirmed, and further defined the imposition of a "substantial burden" as an action that "leaves the aggrieved religious institution without a reasonable means to observe a particular religious precept." *Trinity,* at 96, 941 A.2d 560. Continuing, the Court wrote: "[i]f, however, the religious institution may adhere to that precept through some viable alternative mode, the land use regulation is not a substantial burden on religious exercise, even though it may make that exercise more difficult or expensive." *Id.*

Assuming, *arguendo,* that RLUIPA applies to the Council's decision to deny a water and sewer plan amendment, we do not see how the action imposed a substantial burden under this standard. A review of *Reaching Hearts,* the federal case on which Bethel relies, demonstrates the deficiencies of Bethel's claim.

Reaching Hearts, a congregation of Seventh Day Adventists, purchased a property in rural Prince George's County with the intention of constructing a worship facility. *Reaching Hearts,* 584 F.Supp.2d at 771. At the time, Reaching Hearts was leasing a facility in a conference center that imposed serious limitations on their ability to adhere to the customary practices of Seventh Day Adventists. *Id.* Reaching Heart's development plan for the property was met with hostility from the area's community association based on the community's past experience with another religious institution. *Id.* at 772

In 2003, Reaching Hearts sought a water and sewer category redesignation for a portion of their property, which, incidentally, the court referred to as a "legislative amendment process." [20] *Id.* at 773. At the public hearing on the Reaching Hearts application, there was no negative commentary by

---

20. Part of Reaching Heart's property was already in the category necessary to receive public water and sewer service. *Id.* at 773.

County Council members or witnesses. *Id.* at 774. Nonetheless, at a separate meeting, the Council, after first voting to approve the application, subsequently changed its vote and denied the application, citing environmental concerns and the incongruity of the development proposal with the surrounding area. *Id.* The Council approved almost every other category change request before it at the meeting, including one submitted by a developer for a property on the same road as the proposed church. *Id.* The denial prompted Reaching Hearts to bring a mandamus action, which was denied by the Circuit Court for Prince George's County. *Id.* at 776. This Court affirmed, holding that "(1) RHI had not been prohibited from developing its property and (2) the County Council's discretion to pick and choose among applicants was not arbitrary and capricious action." *Id.*

Reaching Hearts revised its development proposal to build on the segment of its property with the proper water and sewer category designations, but discovered that the plan ran afoul of a newly adopted ordinance limiting impervious surface on properties in the vicinity of reservoirs.[21] *Id.* at 777. Reaching Hearts then submitted a subdivision application that would bring its plan into conformity with the impervious surface limitation by combining its two adjacent parcels. *Id.* at 778. The application was denied. *Id.* Reaching Hearts brought an action for judicial review challenging the denial, which once again failed in circuit court and on appeal to this Court. *Id.*

In 2005, Reaching Hearts submitted a second water and sewer category change request for a portion of the property in order to gain approval for its subdivision application. *Id.* The request was again denied, while twenty-five other requests, all of them for non-religious land uses, were approved.[22] *Id.* at 779. As a result of the combined denials,

---

21. There was at least some evidence that this ordinance was specifically directed at Reaching Hearts. *Id.* at 776.

22. In the interest of brevity, we have omitted certain factual details that further distinguish *Reaching Hearts* from this case.

Reaching Hearts was unable to build any facility on the property. *Id.*

Reaching Hearts responded by filing a complaint in federal district court asserting constitutional and RLUIPA claims, which resulted in a seven-day jury trial. *Id.* at 779–80. The jury found that the actions by Prince George's County were motivated in part by religious discrimination, and imposed a substantial burden on the exercise of Reaching Heart's religion. *Id.* at 779. The County moved for judgment as a matter of law, contending that the findings were not supported by legally sufficient evidence. *Id.* The court denied the motion and upheld the jury's provisional award of damages. *Id.* at 796.

As to the substantial burden claim under RLUIPA, the court cited the extensive evidence elucidated at trial that Reaching Hearts was unable to build any structure on the property as a result of the County's actions. *Id.* at 785. The court further cited evidence that Reaching Hearts "invested hundreds of thousands of dollars in the application processes and purchased the parcel of land with the expectation that it would be able to build on it," and that delay in the process rendered the property vulnerable to foreclosure. *Id.* at 786. Moreover, the court noted that "the jury heard evidence ... that the temporary and limited use of the leased ... facilities for [Reaching Hearts] religious exercise placed substantial pressure on [Reaching Hearts] to violate or choose between its religious beliefs." *Id.* The court also made a point on several occasions to distinguish cases finding no substantial burden where religious institutions were unable to expand existing facilities because Reaching Hearts did not have *any* facility. *Id.* at 785–86.

In this case, the record is entirely devoid of any facts similar to those before the court in *Reaching Hearts.* Bethel cites no evidence in the record, nor have we located any, demonstrating that the Council's action entirely prohibited Bethel from building on its property or caused Bethel to suffer financial loss, or that Bethel's congregation cannot adhere to

the precepts of their religion in their existing facilities. The bald assertions that Bethel's existing facilities are overcrowded is simply not enough to support its substantial burden claim.

Moreover, we are not persuaded that Bethel should have reasonably expected approval of its category change request. The original application submitted by Farm Development prompted the PIF policy review, which was still ongoing at the time Bethel purchased the property. Though the prohibition on PIFs in the RDT zone was not adopted in 2003, the plan expressly stated that it was an interim policy and further revision was necessary to address the concerns raised by PIFs. In addition, as discussed above, the Council essentially halted PIF approvals in the RDT Zone after commencing the policy review. Given these developments, there was no reason for Bethel to expect that approval was automatic when it purchased the property.[23]

Finally, even if there was solid evidence that the Council's action has or will cause Bethel "unreasonable delay, uncertainty and expense" by forcing it to sell the land and purchase an alternative property, these factors do not constitute a "substantial burden" absent accompanying evidence that Bethel was left "without a reasonable means to observe a particular religious precept." *See Trinity,* 407 Md. at 96, 962 A.2d 404 ("If . . . the religious institution may adhere to that precept through some viable alternative mode, the land use regulation is not a substantial burden on religious exercise, even though it may make that exercise more difficult or expensive.").

In sum, there is no evidence that the Council's action has imposed a substantial burden on Bethel's religious exercise as

---

23. We note that Bethel has not pursued a separate argument predicated on vested rights or estoppel, nor are we suggesting it would be successful. *See generally Sycamore Realty Co., Inc. v. People's Counsel of Baltimore County,* 344 Md. 57, 64–67, 684 A.2d 1331 (1996) (discussing application of zoning estoppel and the vested rights principle in Maryland).

608

defined by this Court and the Court of Appeals. Thus, we affirm the judgment below.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT/CROSS–APPELLEE.**